**NATIONAL LABOR RELATIONS BOARD**

v.

**OTIS ELEVATOR CO.**

**No. 28, Docket 22727.**

United States Court of Appeals Second Circuit.

Argued Oct. 6, 1953.

Decided Nov. 10, 1953.

A. Norman Somers, Asst. Gen. Counsel, National Labor Relations Board, Washington, D. C. (George J. Bott, Gen. Counsel, David P. Findling, Asso. Gen. Counsel, and Frederick U. Reel and Mary E. Williamson, Attys., National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

Fayette S. Dunn, New York City, and Helen F. Humphrey, Washington, D. C. (Denham & Humphrey, Washington, D. C., on the brief), for respondent.

Irving Abramson, New York City (Melvin Warshaw, Brooklyn, on the brief), for Local 453, International Union of Electrical, Radio and Machine Workers, C. I. O., amicus curiae.

Before CHASE, Chief Judge, and CLARK and FRANK, Circuit Judges.

PER CURIAM.

The issues presented by this petition are stated in the opinion of

Judge Clark with which there is unanimous agreement in so far as there is enforcement of that part of the order which requires the respondent to make available to the union certain time-study data in its possession which was used in setting up the standards.

■ The majority does not agree, however, that the refusal of the respondent to permit the union to use its plant to make an independent time-study was a violation of § 8(a)(1)(5) of the Act, 29 U.S.C.A. § 158(a)(1)(5). Unlike the disclosure of pertinent data on which the respondent had relied in setting up the standards, which concededly it has the exclusive right to establish pursuant to the contract, this part of the order required the respondent to permit the invasion of its property by the union to assemble data presumably different from that on which the standards were based. Whether the standards set by the respondent do in fact give a reasonable leeway for its employees affected by them to earn premium wages by the exertion of extra effort depends, of course, upon whether the amount of effort required for a unit of production is more than it reasonably would be. That is knowledge which the union already has, or should have, acquired through the trial by its members of the wage incentive system as implemented by the respondent's standards. No invasion of the respondent's plant is needed to get that. Obviously, by changing the standards to decrease the amount of production per unit the opportunity to earn premium wages will be *pro tanto* increased and no invasion of the respondent's plant is needed to show that. Given a fair opportunity to study the data used by the respondent in fixing the standards, the union will have been advised as to the manner in which they were established and will have an adequate basis on which to determine, in the light of the actual experience of its members, what position it should take in respect to the processing of the grievance concerning them pursuant to the terms of the contract. The obligation of the respondent under the Act to bargain collectively in good faith in respect to this grievance does not, in the opinion of the majority, impose any duty upon it to open its plant to representatives of the union to enable them to make new time-studies to obtain new data on which to formulate new standards.

Order modified by striking out the provision for time-studies in the respondent's plant by representatives of the union and, as modified, enforced.

CLARK, Circuit Judge (concurring in part and dissenting in part).

This is a petition by the National Labor Relations Board under § 10(e) of the National Labor Relations Act as amended, 29 U.S.C. § 160(e), for enforcement of an order, 102 N.L.R.B. No. 72, which required Otis Elevator Company, the respondent employer, to cease and desist from refusing to bargain collectively by refusing to furnish the certified bargaining representative of the employees certain time-study data and refused to allow it to conduct an independent time study, and which affirmatively directed that the data be furnished and the independent study be permitted. Thus the proceeding brings before us the issue whether the Board may properly require the employer to make available to the Union representing its employees the time-study data on which it based certain work standards, and whether it must allow the Union to make certain independent time studies.

International Union of Electrical, Radio and Machine Workers, Local No. 453, C. I. O., was certified as the exclusive bargaining representative for certain of respondent's employees in 1949, and continued as such throughout the period here involved. After certification the Union executed a contract with respondent, providing, among other things, for an incentive system whereby respondent undertook to set work standards which would guarantee a minimum rate to all employees and would further enable the average employee who was

trained and experienced in the occupation in which he was engaged to increase his earnings at least 25 per cent through incentive premiums offered for extra effort. Under the system each job was rated in terms of units, a unit being the amount of work which an average trained worker, expending ordinary effort, could accomplish in a minute. Thus 60 units an hour would be a normal ordinary accomplishment for such an employee; in any event, if he produced 60 units or less, he was to be paid at the 60-unit rate. If, however, he produced more than this, he received proportional premium wages. And the contract guaranteed that the average experienced worker, with extra effort, would be able to produce at least 75 units an hour. When respondent from time to time changed its machines or production methods, it was bound to establish a new standard which conformed to the system. The contract further provided that in establishing standards respondent should use certain forms of time-study data.

In September, 1950, the Union initiated a grievance in connection with the operation of a new coil-taping machine installed about six months earlier, and contested the adequacy of the production standard established for that operation. The Union contended that after a fair trial it was found impossible to earn the minimum premium wage guaranteed by the contract. Respondent took the position that the operators were not putting forth the required extra effort, and had not given the standards sufficient trial. In addition, respondent explained that an engineer was investigating the job, and that he would correct any discovered inequities.

The complaint passed quickly through the first two steps of the grievance procedure, and was taken up at the third stage or higher level at meetings between representatives of respondent and the Union Grievance Committee. During the course of these meetings, as was respondent's custom, it produced its file as to the standard for the Union's inspection in an effort to explain its position. But the volume and complexity of the material was such that it could not possibly be analyzed and digested in the opportunity presented. Later the Union requested permission to bring its own time-study man in to study the job; and when this was refused it asked for copies of respondent's file of data, which also were refused. These refusals were held by the Board to be violations of §§ 8(a)(1) and (5) of the Act, 29 U.S.C. §§ 158(a)(1) and (5).

The Union concedes that under the contract respondent has the exclusive right to establish standards in the first instance. But it urges that it needs the requested information to evaluate its supposed grievance intelligently and to bargain effectively with respect to it, and, should bargaining fail, to present its case adequately to an arbitrator, the next step under the contract grievance procedure. The refusals thwart its proper policing function.

Respondent, on the other hand, contends that under the contract the Union's interest is confined to the adequacy or fairness of the contract as measured by its *effect*; that the Union has bargained away any right to examine the data underlying the standard; that compilation and correlation of such data are completely in the area of managerial prerogative, not subject to union scrutiny or challenge; and that should an independent study be needed, it should await the order of an arbitrator.

 We do not doubt that there are areas where it is highly desirable that management have exclusive responsibility for decisions, subject only to the most general of checks on the part of the union. See Cox & Dunlop, Regulation of Collective Bargaining by the National Labor Relations Board, 63 Harv. L.Rev. 389, 401–418. And it seems clear that the parties to a labor agreement may place an administrative function within the exclusive control of one side. N.L.R.B. v. American Nat. Ins. Co., 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027. But the general philosophy of the Act

and the general desirability of joint participation and responsibility suggest that any such private reservations of power must be clearly described and delimited in the contract.

Turning to the contract here, we find that the employer undertakes to set standards, using one of four designated usual methods; to revise the standards whenever changes affect the operation; and

"(i) When an operator being time studied so requests, the time study man will advise him as to the high and low ratings given during the study and an estimate of the combined rating resulting therefrom. This cannot be accurately determined prior to the compilation of all of the figures for the various elements that go to make up the standard. When new production standards are hereafter released for use, they will appear on a form which will be supplied to the department. The form shall give the effective date of the standard, the average coding and relaxation used (except where standard data has been used), the equipment to which the standard applies, tooling required, speeds and feeds to be used and other pertinent information. This form will be retained in the department for the use of the operator when such work is assigned."

Respondent, advancing an *expressio unius* argument, contends that this sets forth his entire obligation to impart information and constitutes a waiver of any additional Union rights. We cannot agree. In the atmosphere of collective bargaining in labor relations, it is reasonable to require that the parties set forth the terms on which they have agreed. But the drawing of broad inferences of waiver from their silence would be disruptive rather than fostering of amicable relations. See N.L.R.B. v. J. H. Allison & Co., 6 Cir., 165 F.2d 766, 768, 3 A.L.R.2d 990, certiorari denied J. H. Allison & Co. v. N.L.R.B., 335 U.S. 814, 69 S.Ct. 31, 93 L.Ed. 369. The

language quoted from the contract carries the implication of a general intent to keep the operator informed as to the development of time studies affecting him. In the absence of an express provision this should not be read as limiting requests on behalf of the employees for information, but rather as in general supporting them. We think, therefore, that the general principles of free access to information relevant to bargainable issues must apply. N.L.R.B. v. Jacobs Mfg. Co., 2 Cir., 196 F.2d 680; N.L.R.B. v. Yawman & Erbe Mfg. Co., 2 Cir., 187 F.2d 947.

With this principle accepted, respondent's further contentions are quickly disposed of. It urges that all time-study data leading eventually to the fixing of wages must include a subjective judgment on the part of the evaluator as to the skill and effort being employed by the operator under observation, and that the impossibility of checking this subjective element renders the data useless to the challenging Union. There is ample evidence to support the finding that, apart from the subjective element, error in the data can appear in the objective analysis of the operation, and that this could disclose the source of the grievance. Clearly, then, such data fall within the standard of relevance set forth by us in N.L.R.B. v. Yawman & Erbe Mfg. Co., supra, 2 Cir., 187 F.2d 947.

As for the independent time study sought by the Union, this differs at most in degree and not in kind from the other sources of information thus allowed it. The data in respondent's possession do, or at least may, present an incomplete picture. If the Union is really to attempt to appraise or correct this, it must supply its own substitute. Indeed, the Trial Examiner actually found the Union entitled to such a study, although he did not carry through to hold the respondent's refusal a violation of the Act, since he found that an independent study would be available to an arbitrator at the next step of the grievance procedure, and that such studies had been allowed

in the past. And respondent, in supporting the Trial Examiner's ruling as to the availability of an independent study conducted by an arbitrator, in effect concedes the ultimate need of such a study if adequate information for settlement of the grievance is to be had.

But if this is so, if the Union may go behind a standard to examine its foundation and if on occasion or ultimately such a study is needed in the examination thus permitted, no good reason is perceived for its denial at an early and effective stage in the procedure. If the Union is to be allowed to acquire some information, it should not be stopped short of the most useful data it can develop; nor should it be forced to grope somewhat blindly through the very stages of grievance procedure, where adequate information is most likely to lead the parties to amicable agreement, to await an arbitrator-conducted study to the same end. In the writer's view the Board at least acted within its powers in overruling the Trial Examiner and ordering the respondent to permit the Union to conduct its own time study. As the Board found, the possibility of a time study at the arbitration stage was inadequate to satisfy the legitimate Union request. The contract was silent as to any such right, and the fact that respondent had allowed arbitrators in the past to obtain independent time studies and indicated its intention to do so in the future did not eradicate respondent's consistent denial of any Union right thereto. The Board was therefore settling the doubt by a definite ruling.

Respondent asserts that the result here reached destroys its exclusive right to set standards in the first instance, and thus in effect rewrites the contract. But this initial right has not been affected. Standards will still be established in accordance with respondent's unilateral determination. All the Board has given the Union is the right independently to examine and check the data underlying the standard so that it may intelligently handle its grievances and police its contract. So we are agreed that the Union must be shown the time studies; while I believe the Board could properly allow the Union to check this against its own data, my brothers' disagreement on this point will lead to the modification of the decree as they direct.