SINCLAIR REFINING COMPANY,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 19282.

United States Court of Appeals
Fifth Circuit.

July 26, 1962.

**570**

Tom M. Davis, John B. Abercrombie, V. R. Burch, Jr., Houston, Tex., Clarence D. Musser, New York City, Baker, Botts, Shepherd & Coates, Houston, Tex., of counsel, for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Dominick L. Manoli, Assoc. Gen. Counsel, N. L. R. B., Samuel M. Singer, Atty., N. L. R. B., Washington, D. C., Stuart Rothman, Gen. Counsel, Seymour Strongin, Attorneys, National Labor Relations Board, for respondent.

Before TUTTLE, Chief Judge, and RIVES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

Time and tide, it is said, waits for no man. Neither does the law. For we may acknowledge that in all likelihood the result of this decision is different from what it would have been just five years ago. What has brought this about is not the slow but sure erosion of cherished and ancient precedents or the most spectacular overruling of them by name. Neither has it been the consequence of new legislation. What has brought this about is the recent judicial declaration of an intervening congressional policy which in turn calls now for judicial adaptation and accommodation. Brotherhood of Railroad Trainmen v. Chicago, River & Indiana Ry. Co., 1957, 353 U.S. 30, 40, 77 S.Ct. 635, 1 L.Ed.2d 622.

The problem is the extent to which the coercive sanctions of the Board may be used as a discovery weapon in the processing of a grievance under arbitration machinery established by a collective bargaining agreement. The intervening event regarded by us as portentous is the action of the Supreme Court in the triology concerning judicial enforcement of agreements to arbitrate.[1]

In this area, the Board's order is an awesome adjudication that the employer is guilty of a § 8(a) (5) unfair labor practice for failure to bargain in good faith. Noncompliance with such inferential order to produce data in the course of a pending arbitration proceeding brings to bear the full weight of the Board, and on enforcement, the full prestige of a Court of Appeals. This includes, of course, the imminence of a judgment for contempt. Cf. Cone Brothers Contracting Co. v. N. L. R. B., 5 Cir., 1956, 235 F.2d 37, 41.

Ironically enforcement here of the Board's order to produce data for use in the prosecution of the pending grievance will be to make the grievance proceeding largely superfluous. For enforcement will be a judicial declaration that the Union's, not the Employer's, interpretation of the contract is the correct one. But just as a Court, under the guise of determining arbitrability, may not determine the merits, neither may the Board adjudicate the grievance dispute

1. United Steelworkers of America v. American Manufacturing Co., 1960, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403; United Steelworkers of America v. Warrior & Gulf Navigation Co., 1960, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409; United Steelworkers of America v. Enterprise Wheel & Car Corp., 1960, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424.

under the guise of determining relevance and pertinency of the data sought. Because the order under review clashes with the policy of effectual achievement of contractual arbitration, it may not be enforced.

Of course, running through this whole problem is the acceptance of the principle that the obligation to bargain in good faith [2] includes the duty of the employer to furnish to the union relevant data to enable the representative effectually to bargain for the workers. N. L. R. B. v. Truitt Mfg. Co., 1956, 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (and annotation 100 L.Ed. 1035); N. L. R. B. v. F. W. Woolworth Co., 9 Cir., 1956, 235 F.2d 319, reversed, 352 U.S. 938, 77 S.Ct. 261, 1 L.Ed.2d 235. Also, the duty does not terminate with the signing of the collective bargaining contract. It continues through the life of the agreements so far as it is necessary to enable the parties to administer the contract and resolve grievances or disputes.[3]

In accordance with the collective bargaining contract between the Union and the Employer, a written grievance was filed on April 28, 1960. The complaint was that the announced demotion of two employees of the Pipe Department was in violation of the contract. For reasons that are not of any present moment, the grievances undertook to spell out that this was the result of contractually wrongful assignment or allocation of work or workers, or both, in the Replacement Pool and the Labor Department. To this the Employer took the position immediately, to which it still adheres, that since this proposed demotion was occasioned by a *lack of work*, the controversy was not intrinsicially subject to review under the grievance procedure because under Article XXXI,[4] this was a matter committed solely to management decision.[5] But the Employer was careful to point out then, and now, that its contention went to the merits of the dispute. It did not then, nor does it now, challenge arbitrability. Its position simply stated is that while the controversy is properly a matter for determination by the grievance machinery on its merits the action was of a kind committed solely to mangement with the Union having no right to challenge or question it in any way. When and as the prior steps are exhausted, the Employer acknowledges that the dispute is subject to ar-

2. "For the purposes of this section, to bargain collectively is the * * * obligation * * * to * * * confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, * * *." 29 U.S.C.A. § 158(d).

3. J. I. Case Co. v. N. L. R. B., 7 Cir., 1958, 253 F.2d 149; N. L. R. B. v. John S. Swift Co., 7 Cir., 1960, 277 F.2d 641; International Woodworkers of America, Local Unions 6–7 and 6–122, AFL–CIO v. N. L. R. B., 105 U.S.App.D.C. 37, 1958, 263 F.2d 483; N. L. R. B. v. Otis Elevator Co., 2 Cir., 1953, 208 F.2d 176; N. L. R. B. v. Item Co., 5 Cir., 1955, 220 F.2d 956.

4. To facilitate discussion the bracketed numbers, e. g., [1], have been inserted.
"ARTICLE XXXI
"Management's Rights
"The Union recognizes that operation of the Employer's facilities and the direction of the working forces, including [1] the right to hire, [2] suspend or discharge for good and sufficient cause and pursuant to the seniority Article of this agreement, [3] the right to relieve employees from duties because of *lack of work*, are among the sole prerogatives of the Employer; provided, however, that this section will not be used to discriminate against any member of the Union and [2a] such suspensions and discharges shall be subject to the grievance and arbitration clause of this working agreement; [4] provided, further, this section shall not act to interfere with the Union's right as elsewhere set forth in this agreement." (Emphasis added)

5. The Board has held that if the action is otherwise in good faith, it is not a failure to bargain to assert that a proposed grievance is not subject to the grievance machinery. Jacobs Manufacturing Co., 94 NLRB 1214, 1225; Textron Puerto Rico, 107 NLRB 583.

bitration.[6] There is thus no effort to raise questions of arbitrability such as in Lodge No. 12, etc. v. Cameron Iron Works, Inc., 5 Cir., 1961, 292 F.2d 112; Refinery Employers Union of Lake Charles Area v. Continental Oil Co., 5 Cir., 1959, 268 F.2d 447, or the like. The Employer has made equally positive that it does not decline absolutely to produce the data. On the contrary, at each and every stage, it has reaffirmed a positive commitment to produce whatever the arbiter requires. But consistent with its views on contract interpretation, it says that it is for the arbitrator, not the Board to determine the need and make the demand.

In a nutshell, the Employer's contention in handling the grievance was that under Article XXXI, note 4, supra, a suspension or discharge referred to in [2] was, as clause [2a] stated, "subject to the grievance and arbitration clause" of the contract. However, the layoff or demotion of an employee "because of lack of work" as in clause [3] was not subject to arbitration. In other words, management alone was to determine whether there was lack of work and, on such determination, the nature and extent of the rearrangement or reduction in the labor force.

Preliminary to the detailed outline of the four-step procedure culminating in binding arbitration, the goal of the grievance procedure was described:

"It is the sincere desire of both parties that employee grievances be settled as fairly and as quickly as possible. Therefore, when a griev-ance arises, the following procedure must be followed:"

While the grievance was in the first two steps, the Union, on May 2, 1960, demanded that the Employer furnish "all records that reflect or tend to reflect" the following information:

(1) " * * * the amount of work hours for the separate jobs performed by the pipe department for the past year to date."

(2) " * * * the placement and/or job assignments of all replacement pool employees from January 1, 1960, to date."

(3) " * * * the work hours and separate job assignments for the labor department [from January 1, 1960 to May 2, 1960]."

Concerning the data requested, the letter demand stated, "This information is needed so we can intelligenty evaluate this grievance with respect to settlement of or further processing of same." Although the contention is no longer urged that compliance with the demand was excessively burdensome, it is plain that the demand covers a large volume of papers.[7]

The Employer declined to furnish this data for the reason that, as it had consistently stated, this announced demotion was solely for management's decision. Since, under its interpretation of the contract, the Union had no right to question management's judgment that there was a *lack of work*, there was no subject matter for grievance determination and therefore the data sought, even if otherwise relevant was wholly immaterial. The Union thereupon filed a complaint with the regional director. There-

6. In the contract a grievance was broadly defined: "A grievance is defined to be any difference regarding wages, hours or working conditions between the parties hereto or between the Employer and an employee covered by this working agreement which might arise within any plant or within any region of operations." Article XVVI

7. The Employer estimated some 15,000 time sheets were involved of which 2400 reflected work performed by the Pipe or Labor Departments or Replacement Pool; after segregating the 2400 time sheets from the 15,000, it would be necessary to collate the 2400 sheets with approximately 4800 work orders; further information would be needed to show the particular work performed by the particular individual employees.

after the General Counsel filed a charge that the Employer had violated § 8(a) (5) and (1), as the refusal to furnish the requested data constituted a failure to bargain in good faith. By its answer and defense before the Trial Examiner, the Employer vigorously renewed its basic contention that the data was not relevant or pertinent since the subject matter was not for grievance determination.[8]

The report of the Trial Examiner, as did his consistent rulings in excluding evidence indicating prior practical construction of the collective bargaining agreement and particularly Article XXXI, demonstrated that the Examiner considered that the duty to supply the data was not affected by the merits of the grievance, i. e., the *correctness or incorrectness* of the Employer's interpretation of Article XXXI. He repeatedly stated that he was not undertaking to decide the relative merits of that grievance. But without ever indicating how data concerning work done, or availability of work for the future, could have any possible bearing upon determination of the dispute if the Union was not legally entitled to challenge the Employer's determination of a "lack of work," the Examiner nevertheless held that the Employer had a duty to supply the data. *Consequently, its failure to do so constituted failure to bargain in good faith.* Practically none of this rationale (or absence of it) survived. For with the exception of the conclusion that there was a duty to furnish the data in connection with a grievance perhaps not legally open under the contract in order to determine whether the Union wanted to "settle" or "prosecute" such a grievance, the Board met the issue head-on. By its decision, and particularly by the supplemental report on rehearing, it faced up to the basic proposition that the data was relevant and pertinent only in the event the matter of *lack of work* was open to

question by the Union. In its words, it conceived the threshold question to be: "1. Was the grievance cognizable under the contract?" Describing the grievance and the Employer's assigned reason of a "lack of work in the pipe department," the Board continued:

"The [Employer] contends that the contract * * * authorized it to effect unilaterally reductions in force for lack of work, thereby removing such actions from the coverage of the contractual grievance procedure and from the area of collective bargaining. The [Employer] points to Article XXXI of its contract, which reads: ' * * * the right to relieve employees from duties because of lack of work, are among the sole prerogatives of the Employer * * *.'

"From the fact that the proviso [see [2a], note 4, supra] in the foregoing clause reserves to the Union the right to grieve about suspensions and discharges for cause but not about changes in tenure because of lack of work, the [Employer] argues that it was not intended that such matters would be subject to the contractual grievance procedure. However, the [Employer's] construction equates 'lack of work' in the following clause with 'alleged lack of work.' Thus, the [Employer] would read the clause as excepting from the grievance procedure any personnel action which it alleges to be due to lack of work. This would provide a facile device for bypassing the grievance procedure altogether with respect to any personnel action. We do not believe that such was the intent of the parties. We believe rather that a proper construction of the clause in the light of other provisions of the contract is that where the [Employer] takes some personnel action be-

---

8. The Employer also contended that (a) data of past work would not be of any cogency in showing future lack of work, and (b) supplying the data would be un-reasonably burdensome. It no longer advances (b) and we find it unnecessary to pass on (a).

cause of alleged lack of work * * the Union may not contend that the [Employer] should have taken a different action * * * but may dispute under the grievance procedure whether there is in fact a lack of work and attempt to show that the proposed action is in fact motivated by other considerations which are proscribed by the contract.

"In other words, while Article XXXI exempts from the grievance procedure any management decision as to what personnel action to take in case of lack of work that Article does not remove from the grievance procedure any dispute, such as exists here, as to whether there actually is any lack of work. * * *."

On the basis of this crucial conclusion, the Board further found that the data would be relevant in showing distribution of work among the departments and the probable amount of work in the future. Rejecting the Employer's contention that it was trying to arbitrate the matter, it also held that an employer's repeated willingness to process the grievance through to binding arbitration was "no defense to a refusal to furnish information which a union needs in order to enable it to bargain intelligently."

In unmistakable terms, then, the Board, in order to determine relevance and pertinency—and hence the amenability of such evidence to a coercive order to produce—had to determine the very issue in dispute. Whether Courts might in the past have enforced a Board order having such direct consequences is no longer decisive. We may assume that they would. Actually, this situation has not been squarely posed. All of the Court decisions have turned more on general questions of relevancy and pertinency in the sense of operational cogency. This has led this Court to align itself with the earlier decision of the 4th Circuit to adopt what was described as the broad rule. N. L. R. B. v. Item Co., 5 Cir., 1955, 220 F.2d 956; N. L. R. B. v. Whitin Machine Works, 4 Cir.,

1954, 217 F.2d 593. Thus, once it is assumed that the controversy over "lack of work" was a matter which could be questioned by the Union, our Item decision would undoubtedly sustain the Board's discretionary judgment that even though the future could not be foretold by the past, the data concerning the past would probably throw some light both on what had been done and what might likely be expected in the immediate future. Others have reflected a like liberality. N. L. R. B. v. Otis Elevator Co., 2 Cir., 1953, 208 F.2d 176; N. L. R. B. v. Yawman & Erbe Manufacturing Co., 2 Cir., 1951, 187 F.2d 947. In International Woodworkers of America Local Unions 6–7 and 6–122, AFL-CIO v. N. L. R. B., 105 U.S.App.D.C. 37, 1958, 263 F.2d 483, the Court, sustaining an order as to traditional wage data while denying enforcement as to sales and promotional information, apparently undertook to distinguish along lines of legal relevance.

But we must candidly recognize that in these cases where data was sought in resolving existing disputes—whether yet as a part of a formalized grievance proceeding or not—or for general bargaining purposes, the Courts have assumed that it is proper to resort to a § 8(a) (5) unfair labor practice Board order to enforce the obligation to furnish data. That result would have followed without regard to, and independent of, the operation of the grievance machinery in a pending formal grievance which will culminate in binding arbitration. One could certainly read that much in the J. I. Case Co. v. N. L. R. B., 7 Cir., 1958, 253 F.2d 149. Back of this assumption two things have likely been of influence. Both of them we consider to be of no final legal significance for the situation presented by our case. One is a mistaken reliance on the accepted proposition that the decision of a private arbiter, even though ostensibly binding on the parties, cannot justify violation of the Act or oust the Board of its rightful and exclusive power to effectuate the

policies of the Act.[9] But we are not even close to that stage here. There is no indication that the final disposition of this controversy by the grievance machinery of the contract will terminate in a decision which requires, or permits, or even acquiesces in a practice contrary to the Act. The other factor is a misguided application of another well established principle that a union's waiver will not be implied, but must be clear and unmistakable.[10]

■ To speak of waiver is either meaningless or it begs the question. Waiver is a purposeful relinquishment of a known right. The so-called "right" to data—to question the factual basis for "lack of work"—depends of necessity on the contract. This is so because while the Union has the "right" to data to administer a contract or solve disputes arising under it, 29 U.S.C.A. § 158(d), it is the terms of the contract which will control both the solution and, in a broad sense, the relevance of the data.

■ But we think that this assumption may no longer be made or acted upon. Now we must regard § 8(a) (5) data-producing-order in the light of the pervasive policy to encourage the fullest use of the machinery established by the parties for the resolution of disputes arising under the collective bargaining contract. We do not rule out in every situation resort to Board sanction merely because a contract dispute is pending uncompleted in the contract grievance machinery. But we do hold that the Board proceeding may not be used to secure data for use in a grievance where determination of relevance and pertinency requires determination of the critical substantive issue of the grievance itself.

Or to paraphrase it in the terms of the statute and order, failure to supply such data may not constitute a failure to bargain in good faith. Indeed, phrasing it in this way, it points up the intrinsic contradiction in the present decision: an employer's willingness to abide by, and faithfully carry out, the terms of his contract becomes itself a failure to bargain.

■ In this analysis we must recall that what is involved in a grievance is the claim that the collective bargaining contract is being breached by one party or the other. This grievance-arbitration machinery is, therefore, one of two potential means by which this dispute is resolved. The other is resort to traditional court remedies. For in this aspect of industrial controversy, the Board is not available as a forum to achieve final resolution. This is because Congress, as a matter of deliberate choice, has rejected proposals by which a breach of contract would constitute an unfair labor practice. The Supreme Court has given a recent reminder of this fact. "The bill which the Senate originally passed * * contained a provision making a breach of a collective bargaining agreement an unfair labor practice subject to the jurisdiction of the * * * Board, * * * as well as a provision conferring jurisdiction upon the federal courts over suits for violation of collective agreements. In conference, however, it was decided to make collective bargaining agreements enforceable only in the courts. 'Once parties have made a collective bargaining contract,' the conference report stated, 'the enforcement of that contract should be left to the usual processes of the law and not to the National Labor Relations Board.' H.R.Conf.Rep. No. 510, 80th Cong., 1st Sess. p. 42." Charles Dowd

9. N. L. R. B. v. International Union, 7 Cir., 1952, 194 F.2d 698, 702; N. L. R. B. v. Bell Aircraft Corp., 2 Cir., 1953, 206 F.2d 235; N. L. R. B. v. Walt Disney Productions, 9 Cir., 1944, 146 F.2d 44; N. L. R. B. v. Pacific Intermountain Express Co., 8 Cir., 1955, 228 F.2d 170.

10. See N. L. R. B. v. Gulf Atlantic Warehouse Co., 5 Cir., 1961, 291 F.2d 475,

477; N. L. R. B. v. J. H. Allison & Co., 6 Cir., 1948, 165 F.2d 766, 768, cert. denied, 335 U.S. 814, 69 S.Ct. 31, 93 L. Ed. 369. Cf. N. L. R. B. v. Lion Oil Company, 1957, 352 U.S. 282, 293, 77 S.Ct. 330, 1 L.Ed.2d 331; Armstrong Cork Co. v. N. L. R. B., 5 Cir., 1954, 211 F.2d 843, 848; Utica Observer-Dispatch v N L. R. B., 2 Cir., 1956, 229 F.2d 575, 576.

Box Co., Inc. v. Courtney, 1962, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483, 489.

This was a dominant factor in the case which gave real impetus to the arbitration process by making such agreements judicially enforceable by virtue of § 301, 29 U.S.C.A. § 185. Textile Workers Union v. Lincoln Mills, 1957, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972. We synthesized the rationale of this and the three subsequent decisions.[11] "The Court's approach is the one first articulated in Textile Workers Union v. Lincoln Mills, 1957, 353 U.S. 448, 77 S. Ct. 912, 1 L.Ed.2d 972, that § 301(a) * * * empowers federal courts to compel arbitration and that ' * * * the policy to be applied in enforcing this type of arbitration was that reflected in our national labor laws.' 363 U.S. 574, at pages 577–578, 80 S.Ct. 1347, at page 1350. The congressional policy on the settlement of grievances is reflected in § 203(d), 29 U.S.C.A. § 173(d). And 'That policy can be effectuated only if the means chosen by the parties for settlement of their differences under a collective bargaining agreement is given full play.' 363 U.S. 564, at page 566, 80 S. Ct. 1343, at page 1346. Consequently the run of arbitration cases, e. g., Wilko v. Swan, 1953, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168, is not relevant. 'In the commercial case, arbitration is the substitute for litigation. Here arbitration is the substitute for industrial strife'; and ' * * * arbitration of labor disputes under collective bargaining agreements is part and parcel of the collective bargaining process itself.' 363 U.S. 574, at page 578, 80 S.Ct. 1347, at page 1351. * * *" Lodge No. 12, etc. v. Cameron Iron Works, Inc., 5 Cir., 1961, 292 F.2d 112 at 116.

These cases establish three main things. First, since a breach of contract as such does not constitute an unfair labor practice, determination of such a dispute is not ordinarily for the Board. Second, resolution of these disputes, important as this is to the maintenance of industrial peace, is for the ordinary processes of the law. And third, where the parties have prescribed a voluntary grievance procedure for settlement of such controversies,[12] Courts are to (a) enforce them fully and (b) stay out of the determination of the intrinsic merits under the guise of determining arbitrability.

What the Supreme Court says of the relative incapacity of Judges applies with equal force to those comprising the National Labor Relations Board. This springs from the unique nature of the collective bargaining agreement as something "more than a contract" for, says the Court, "It is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate." 363 U.S. 578, 80 S.Ct. 1351.[13] "A collective bargaining agreement is an effort to erect a system of industrial self-government." 363 U.S. 580, 80 S.Ct. 1351. And "the grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government. Arbitration is the means of solving the unforeseeable by molding a system of private law for all the problems which may arise and to provide for their solution in a way which will generally accord with the variant needs and desires of the parties." 363 U.S. 581, 80 S.Ct. 1352. "The labor arbitrator performs functions which are not normal to the courts; the considerations which help him fashion judgments may indeed be foreign to the competence

11. See note 1, supra.

12. In these cases great stress was laid upon § 203(d) of the Labor Management Relations Act, 1947, 61 Stat. 153, 29 U.S.C.A. § 173(d):
"Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement. * * *"

13. The following citations to volume and page are from United Steelworkers v. Warrior & Gulf Navigation Co., 1960, 363 U.S. 574, 578–582, 80 S.Ct. 1347, 4 L.Ed.2d 1409.

of courts." 363 U.S. 581, 80 S.Ct. 1352. "The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it." 363 U.S. 582, 80 S.Ct. 1352. " * * * the parties expect that his judgment of a particular grievance will reflect not only what the contract says but, insofar as the collective bargaining agreement permits, * * *" other factors of practical consequence. "For the parties' objective in using the arbitration process is primarily to further their common goal of uninterrupted production under the agreement, to make the agreement serve their specialized needs." 363 U.S. 582, 80 S.Ct. 1352.

It is these factors which lead the Court to conclude, "The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed." While Congress has, of course, presumably infused an expertise in the members of the Labor Board with respect to matters committed to its jurisdiction, Garner v. Teamsters, Chauffeurs and Helpers Local Union, 1953, 346 U.S. 485, 490, 74 S.Ct. 161, 98 L.Ed. 228, it has "expressly rejected that policy with respect to violations of collective bargaining agreements * * *." Charles Dowd Box Co., Inc. v. Courtney, 1962, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed. 2d 483, 490. Those controversies are left "to the usual processes of the law." The processes of the law are, of course, either traditional court action or the grievance machinery where established.

Actually this approach is not hostile to the policy which the Board itself has followed with rare exceptions. Certainly its most recent decision is in complete accord, both in the action taken and the supporting reasons. In Hercules Motor Corp.,[14] 136 NLRB [No. 145]—, the Board reversed the Trial Examiner's finding that an employer was guilty of a § 8(a) (5) refusal to bargain for failure to supply certain time study data in connection with a pending grievance. The Board described the case in this way. "The Union's grievance involved a dispute concerning interpretation of the contract provisions * * *, the Union interpreting the contract as giving it the right to grieve over the equity of [the Employer's] rates, and the [Employer] insisting that the Union was incorrectly interpreting the contract. On its face, the contract provides machinery devised by the parties themselves for settling such disputes. Yet, instead of exhausting this procedure and proceeding within the framework of its contract, the Union elected to file charges asking the Board to intervene and resolve the dispute." The Board, after referring to § 201(a), 29 U.S.C.A. § 171(a), and § 203(d), footnote 12, supra, the trilogy opinions of the Supreme Court requiring that grievance machinery be given full play, reached this conclusion. "If, instead of requiring the Union in this case to give 'full play' to the grievance procedure, we were to permit the facilities provided by the Act to be used in avoidance of the bargaining agreement, we would be frustrating the Act's policy of promoting industrial stabilization through collective bargaining agreements." The Board went on, "In this case * * * the Union sought information to support a grievance over a matter which the [Employer] maintained could not be the subject of a grievance under the contract * * *. There thus arose a dispute between the parties as to the interpretation of their contract * * *. This was a dispute for whose resolution the contract specifically provided machinery and the [Employer] properly insisted that it be settled within the agreed-upon grievance procedure." And then the Board brought it down to the very nub of our controversy, "Manifestly, the in-

14. Hercules Motor Corp. and International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, AFL–CIO, and its Local 161, Case No. 8–CA–2094.

formation which the Union sought * * could have no bearing upon the resolution of this dispute over contract interpretation." [15] 136 NLRB ——, ——.

■ Once we accept the sweeping principles—as we must—established in the three arbitration cases (note 1, supra), and to which we give full application,[16] this very record demonstrates the wisdom of the rule which we here announce. Under the grievance machinery established in the contract, steps 1, 2 and 3 had to be completed within 83 days. Binding arbitration, step 4, could thereafter be sought within 60 days with submission to the board of arbiters within 10 days. From inception to final submission only 153 days is permitted. In contrast to this, resort to the coercive sanctions of the Board has brought the grievance machinery to a dead halt. In the meantime, with inevitable delays in the administrative and judicial review process, the second anniversary of the grievance of April 28, 1960, has taken place.[17] Though the grievance is older, it is hardly wiser, and it is certainly no nearer decision than it was when the parties first squared off.

■ The law now commits to voluntary arbiters chosen voluntarily by the parties decisions having the most profound impact upon the stability, survival and economic, financial wellbeing of a business, its employees, or both. An adjudicatory body having such ominous responsibilities for dealing with matters of transcendent substantive importance may surely be trusted by the law to take steps which lawyers and Judges would characterize as procedural to enable that tribunal to do its work. The parties are not, therefore, left to their own devices nor, worse, at the mercy of the adversary. The industrial arbitration machine is not powerless. We have no doubt that it can fashion suitable sanctions by which to acquire records, data, information and

15. The Board's report, citing Spielberg Manufacturing Co., 112 NLRB 1080, 1081, stated, "It has long been Board policy to recognize and honor arbitration awards in order to promote the 'desirable objective of encouraging the voluntary settlement of labor disputes'"; National Dairy Products Corp., 126 NLRB 434, 435, is similar. "It is clear * * * that the dispute * * * was concerned solely with the interpretation of their contract * * *"; Morton Salt Co., 119 NLRB 1402, 1403, "The Board has long held, however, that it will not effectuate the policies of the Act for it to police collective-bargaining agreements by attempting to resolve disputes over their meaning or administration * *." This was echoed in Crown Zellerbach Corp., 95 NLRB 753; Textron Puerto Rico, 107 NLRB 583, and McDonnell Aircraft Corp., 109 NLRB 930; United Telephone Co. of the West, 112 NLRB 779, "The Board is not the proper forum for parties seeking to remedy an alleged breach of contract or to obtain specific performance of its terms." See also Knight Morley Corp., 116 NLRB 140, which stated, there is "* * * a line of cases which hold, in substance, that where an employer has satisfied its 'channelized' bargaining duty under the grievance procedure of a contract there is no further bargaining duty under the Act."

16. Taft Broadcasting Co. v. Radio Broadcast Technicians Local Union No. 253, 5 Cir., 1962, 298 F.2d 707; International Association of Machinists AFL-CIO v. Hayes Corp., 5 Cir., 1961, 296 F.2d 238.

17. This is the time table:

| | |
|---|---|
| September 12, 1960 | Union charge filed with Board |
| October 27, 1960 | Unfair labor practice complaint |
| November 29, 1960 | Hearing before Trial Examiner |
| April 5, 1961 | Trial Examiner Report |
| October 3, 1961 | Decision of Board |
| October 17, 1961 | Employer's petition to Court of Appeals |
| November 27, 1961 | Original record received |
| January 24, 1962 | Printed record filed |
| February-April 1962 | Briefs filed |
| May 31, 1962 | Oral argument and submission |

evidence thought by the arbiters to be essential for a proper determination of the issue.[18]

But if the Union may, as it has done here, call upon an outside agency as the weapon for discovery of information which, on one of the alternative constructions of the contract, will be completely superfluous, the whole proceeding is necessarily disrupted. The arbiters cannot continue. The whole controversy then shifts from the plant to the nearest Board hearing room, and thereafter to the nation's capital, and then on to the seat of any one of the eleven Courts of Appeals having geographical jurisdiction over the employer. Whatever else that is, it is not giving full play to the means established by the parties. More than lost time, it introduces or magnifies advocative hostility. For now a new adversary has entered the lists—the General Counsel who, from the nature of the complaint, aligns himself with one of the adversaries—the Union—but who as a sort of protector of the general public interest must advance his advocacy, pro and con, not in the manner best calculated to bring an end to the dispute, but in a manner thought, from that lofty vantage, to be best for the general good. Even worse, that diversion ends in a decision which, if it determines the substantive issue adversely to the Employer as does this one leaves the Employer facing an additional adversary—the Board. This makes it necessary for the Employer to resist that determination in order to get the matter back where it started—in the laps of the arbitrators. To do that the Employer must come to court. But the courthouse, says the Supreme Court, is not the place to work out industrial disputes when arbitration has been prescribed and is available.

The action of an employer seeking earnestly to submit every issue in dispute—including relevance and necessity of data sought—to the grievance machinery does not under these circumstances constitute a failure to bargain in good faith.

Enforcement denied.

RIVES, Circuit Judge (dissenting).

Whether or not the Union was entitled to grieve over the Company's determination of a "lack of work," it is nonetheless true that both under the Act and under the express terms of the contract the Union had a right to show, if it could, that the demotions of the two pipefitter helpers were in fact motivated by other considerations, and that such action was being taken to discriminate against them as members of the Union. The failure of the Union to charge that the demotions were improperly motivated or were discriminatory is both responsible and understandable, when we consider that it did not have the information either upon which it could base such charges or from which it could know that such charges were untrue. The Union's letter to the Company's Assistant Plant Manager C. F. Mallory requesting the information stated that, "This information is needed so we can intelligently evaluate this grievance with respect to settlement of or further processing of same." Whether any such further processing of the grievance might include submission of the possible dispute to arbitration is, I submit, immaterial. That step had not been reached and might never be reached if the Union were furnished the information from which it could intelligently evaluate the grievance.

18. The Employer points to Chesapeake & Potomac Telephone Co. of West Virginia, 21 LA 367 (Harry J. Dworkin, 1953); and I. Hirst Enterprises, Inc., 24 LA 44 (Jules J. Justin, 1954). Also Elkouri. How Arbitration Works (2d ed.), p. 181:
"Arbitrators do not hesitate to request the production of data or information if they have reasonable basis to believe that it will be germane to the case. Indeed, the arbitrator himself often initiates the request for the production of the evidence. In other instances the arbitrator may make the request on the motion of the party who otherwise does not have access to the evidence in question."

This Court has heretofore adhered to the very broad rule, first announced by former NLRB Chairman Guy Farmer, under which "wage and related information pertaining to employees in the bargaining unit should, upon request, be made available to the bargaining agent without regard to its immediate relationship to the negotiation or administration of the collective bargaining agreement." National Labor Relations Board v. Item Co., 5 Cir., 1955, 220 F.2d 956, 958, citing Whitin Machine Works, 108 NLRB 1537, aff'd per curiam, 4 Cir., 1954, 217 F.2d 593; cf. Conley v. Gibson, 1957, 355 U.S. 41, 46, 78 S.Ct. 99, 2 L.Ed.2d 80; National Labor Relations Board v. F. W. Woolworth Co., 1956, 352 U.S. 938, 77 S.Ct. 261, 1 L.Ed.2d 235; J. I. Case Co. v. National Labor Relations Board, 7 Cir., 1958, 253 F.2d 149.

No sound ground, such as being confidential, a trade secret, prejudicial, etc., has been asserted or proved why the information sought should not be furnished. The Union's follow-up letter appears to me an appeal to reason in its assertion that " * * * we would much prefer an honest and open discussion with full disclosure of essential facts with a good faith attempt to reach a settlement based on common knowledge of all of the facts and the common problem."

The Board's order simply requires the Company to make available to the Union, upon its request, information concerning:

"(a) Work hours for separate jobs performed by the Pipe Department from May 2, 1959, to May 2, 1960.

"(b) Placement and/or job assignments of all replacement pool employees from January 1, 1960, to May 2, 1960.

"(c) Work hours and separate job assignments for the Labor Department from January 1, 1960, to May 2, 1960."

Good faith collective bargaining requires full knowledge and understanding of all of the relevant facts both by the Company and by the Union. The Union claimed that unless it could study the requested information, it could not evaluate the grievance to determine whether there was in fact a meritorious grievance to be submitted to arbitration. I think that the Board's order should be enforced, and therefore respectfully dissent.