**WAYCROSS SPORTSWEAR, INC.,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent,**
and
**Amalgamated Clothing Workers of America, AFL–CIO, Respondent.**

**No. 24994.**

United States Court of Appeals
Fifth Circuit.

Nov. 20, 1968.

---

E. Kontz Bennett, Sr., Waycross, Ga., for petitioner; Bennett, Pedrick & Bennett, Waycross, Ga., of counsel.

Arthur A. Horowitz, Atty., NLRB, Washington, D. C., for respondent.

Robert J. Rabin, Asst. Gen. Counsel, Jacob Sheinkman, Atty., New York City, for intervenor, Amalgamated Clothing Workers.

Before JOHN R. BROWN, Chief Judge, BELL, Circuit Judge, and HOOPER, District Judge.

JOHN R. BROWN, Chief Judge:

Waycross[1] seeks review of a Board cease and desist order finding Waycross to have violated §§ 8(a) (1) and 8(a) (5) of the National Labor Relations Act. Apart from the usual run of the mill factors in these frequent cases the only significantly new legal problem is the duty of an employer to permit experts selected by a union to make time and motion, piece-work studies within the plant. We answer this in the affirmative, and finding the evidence sufficient as to §§ 8(a) (1) and 8(a) (5), we enforce.

Both the 8(a) (1) and 8(a) (5) matters warrant this judicial look-see in the light of anti-union hostility—a right assuredly open to an employer although one which is properly a factor in evaluating conduct, particularly in the area of motivation and, its close kin, good faith bargaining.[2] This includes the judicially credited findings of illegal 8 (a) (1) discrimination accompanied by discriminatory 8(a) (3) discharges. N. L.R.B. v. Waycross Sportswear, Inc., 5 Cir (March 14, 1968) 391 F.2d 294.[3]

1. Waycross Sportswear, Inc., which is engaged in the manufacture of men's outerwear in Waycross, Georgia.

2. See N.L.R.B. v. Patterson Menhaden Corp., 5 Cir., 1968, 389 F.2d 701, 702–703; N.L.R.B. v. Mayes Bros., Inc., 5 Cir., 1967, 383 F.2d 242, 247; N.L.R.B. v. Southwire Co., 5 Cir., 1965, 352 F.2d 346.

3. To round out the picture but without intimating any possible prejudgment since

No sooner had the opposition to the union's campaign ended unsuccessfully in certification of the Union [4] than management of the highest rank reiterated in unmistakable language not only opposition to the presence of this unwanted agency, but a determination not to deal with it effectively. This happened at the company party given shortly after December 14, 1965. The company president, Kiesler, after summoning Barbara Hall, an active union supporter, employee of Waycross and member of the negotiating committee, into the plant manager's office, had this exchange. He commented: "I hear that you said that you're going to make me negotiate with the union." She denied having said that. Kiesler continued: "Well, how are you going to make me? Are you going to put a gun on me and force me?" Kiesler then remarked to the company vice-president Besen that the Union had misinformed the employees about Kiesler's not being able to close down the plant. Besen then got into the act. He declared: 'I can sell this plant, or turn it into a warehouse with just two employees." Kiesler—with a prescience that was borne out by events to come—then concluded the conversation by informing Barbara Hall: "I will never, never negotiate. I will see you next Christmas and I still will not be negotiating." [5]

■ The company tries to write this off as a jocular exchange between combatants under the spell of the seasonal spirits of this affair. But the trier, with ample basis, found it to be the true reflection of the employer's purpose. This continued to bear fruit, at least in the form of discriminatorily coercive verbal acts by those speaking with the voice of management. "[I]n connection with an unfair labor practice charge * * * an employer is pretty generally bound by what its spokesmen do and say. When * * * an employer sets out to campaign against a union, one of the risks is that out of zeal, ignorance, or otherwise, foreman, supervisors, and similar representatives in championing the anti-union cause will overstep the mark. Since it is the policy of the Act to protect employees in a free choice of a bargaining representative, the law looks to what the listener-employees reasonably could have inferred from what was said and done by one authorized to engage in the anti-union preelection campaign. It is what he said or did, not what he was told to say, do, or not to say or do, that counts." [6] On January 13, 1966, the day after the first bargaining session (see n. 5 supra) a Waycross employee serving as one of the negotiators was informed by her immediate supervisor that the employee could be pulled off negotiations to perform work, and in any event she could not see why the Union was wasting time trying to negotiate a contract since President Kiesler had already said that he would never negotiate one. The supervisor repeated this in February 1966. In June 1966, another employee was approached by her supervisor. Putting it in terms of getting a promotion

they may now, or soon will, be on their way to this Court for enforcement-review, the Board has since entered two further orders. In 10–CA–6890, April 9, 1968, 170 N.L.R.B. 139, 68 L.R.R.M. 1107, the Board entered a § 8(a)(5) order because of the company's unilateral wage increase in January 1967 prior to resumption of bargaining sessions. In No. 10–CA–7211, May 21, 1968, 171 N.L. R.B. 77, L.R.R.M., the Board granted a summary judgment of § 8(a)(5) violation for refusal to bargain and the company's announced determination to grant a wage increase in January 1968.

Of course we do hold that for all matters within the charges and evidence of our present case the company stands convicted of § 8(a)(5) refusal to bargain.

4. Amalgamated Clothing Workers of America, AFL–CIO. The election was held November 19, 1965, and the Union was certified on December 14, 1965.

5. Bargaining sessions commenced January 12, 1966, and broke off on September 29, 1966.

6. Hendrix Mfg. Co. v. N.L.R.B., 5 Cir., 1963, 321 F.2d 100, 104.

to a better specific task, the supervisor in effect told the employee that if she abandoned her support for the Union a better job would be forthcoming.

■ These facts, amply supported, of course clearly establish a violation of § 8(a) (1). The attitude of the company's management against negotiating with the Union, coupled with the promise of benefit to an employee and the implied threat to close down the plant would all have the effect of interfering with the rights of the employees guaranteed by § 7 of the Act.[7] But they do much more. They are the very atmosphere in which good faith bargaining is to be judged.

Since the parties did get together on some twenty-one occasions so that refusal to bargain in good faith is not the mere problem of an outright refusal to meet, the ultimate decision turns on many things from which the trier is to determine whether the actions are out of a genuine purpose to try to reach an agreement or just to give the appearance of negotiation. Little is served therefore in trying to catalogue the acts or incidents.

■ In the atmosphere generated by the company's conduct and attitude, we think it sufficient merely to state that in the rather restrictive times for the meetings which the company insisted upon, the time so extensively used either in non-relevant discussions or repetitive recapitulations from meeting-to-meeting on matters previously resolved, the surface bargaining manifested by "concessions" on matters over which the parties had no real freedom (e. g., federal, state or both standards on minimum wages, hours of work, etc.), the delay in supplying information on piece-work wage rates, the insufficiency of the in-formation when finally furnished, the adamant refusal to permit in-plant time studies by a Union expert, the company's refusal to consider any wage increase because of jeopardy to its competitive position with an inability even to identify such competitors, its ·offer on vacations which would produce less than current vacations, its refusal to permit check off of Union dues even at Union expense and the company's complete indifference to repeated requests by the Union after the September 29, 1966 break-off to resume sessions, all add up, as record supported facts, to warrant the trier's conclusion that this was not good faith bargaining on the company's part.[8]

A part of the refusal to bargain proof rests in part in the context of this record on the company's persistent refusal to allow an in-plant study by an expert in piece-work analysis. Need for it was clearly shown in this record. The Union requested early in the bargaining that it be furnished detailed data on the earnings of each employee. After much delay this was finally supplied but it soon proved inadequate. On analysis the figures revealed that this piece-work scale generated wages below the Federal statutory minimum with a required adjustment upward unrelated to piece-work. More than that, the nature of piece-work as a means of wage determination inevitably involves the elements of incentive, fair compensation and fair standards of output. These in turn, from the nature of things involve more than the simple scale stated in terms of cents per piece. Included would be operational methods in the light of human skills, the adequacy or inadequacy of machinery, and the like. These can be analyzed only by opportunity for observation, sampling, testing, analysis, etc.

7. See N.L.R.B. v. Ambox, Inc., 5 Cir., 1966, 357 F.2d 138; N.L.R.B. v. Zanes Ewalt Warehouse, Inc., 5 Cir., 1967, 384 F.2d 794; N.L.R.B. v. Louisiana Mfg. Co., 8 Cir., 1967, 374 F.2d 696; N.L.R.B. v. Fitzgerald, 2 Cir., 1963, 313 F.2d 260.

8. See, among the many cases in this expanding area, N.L.R.B. v. Texas Coca-Cola Bottling Co., 5 Cir., 1966, 365 F.2d 321, 322–323; San Antonio Machine & Supply Corp. v. N.L.R.B., 5 Cir., 1966, 363 F.2d 633, 635, 641; N.L.R.B. v. Exchange Parts Co., 5 Cir., 1965, 339 F.2d 829, 830, 832; and N.L.R.B. v. Herman Sausage Co., 5 Cir., 1960, 275 F.2d 229.

The Company did not deny either the competence or responsibility of the Union's proffered expert. It put forward the weak contention that this would interfere with "management prerogatives" and would cause disruption in the plant from the temptation of the expert to solicit union support on the side. It also urged the Union could get the information from talking to the employees. None of these has much merit. Time and motion studies are too sophisticated to be a matter left to the unskilled observation (and recollection) of those doing the work. And the Board's representatives can make certain that the studies are conducted in a way to avoid disruption either in morale or operations and with safety to the inspector as well as others.

■ We agree with the Second Circuit's recent decision holding that the refusal of an employer to allow the Union to make a piece-rate study in connection with evaluating the merits of a grievance constitute independently a violation of § 8(a) (5). Fafnir Bearing Co. v. N.L.R.B., 2 Cir., 1966, 362 F.2d 716.[9] If needed during the performance under an existing contract, such information may be of even more significance in negotiations looking toward the making of an agreement. The demand here was reasonable and well supported in need. The refusal by Waycross violated "the duty of the employer to furnish to the union relevant data to enable the representative effectually to bargain for the workers." Sinclair Ref. Co. v. N.L.R.B., 5 Cir., 1962, 306 F.2d 569, 571; N.L.R.B. v. Truitt Mfg. Co., 1956, 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027.

Enforced.

9. See N.L.R.B. v. Acme Industrial Co., 1967, 385 U.S. 432, 438 n. 8, 87 S.Ct. 565, 569 n. 8, 17 L.Ed.2d 495, 500 n. 8, quoting *Fafnir*. " 'By preventing the Union from conducting these studies [for an intelligent appraisal of its right to grieve], the Company was, in essence,

requiring it to play a game of blind man's bluff.' "

We reject the company's insistence that we should follow the Second Circuit's earlier decision in N.L.R.B. v. Otis Elevator Co., 2 Cir., 1953, 208 F.2d 176.