The FAFNIR BEARING COMPANY,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

and

International Union, United Automobile,
Aerospace and Agricultural Implement
Workers of America, Local 133, UAW,
AFL-CIO, Intervenor.

No. 352, Docket 29243.

United States Court of Appeals
Second Circuit.

Argued April 27, 1966.

Decided June 17, 1966.

Lucian E. Baldwin, Hartford, Conn. (Robinson, Robinson & Cole, William K. Cole, Hartford, Conn., on the brief), for petitioner.

Norton J. Come, National Labor Relations Board (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Nancy M. Sherman and Peter M. Giesey, Attys., on the brief), for respondent.

John Silard, Washington, D. C. (Joseph L. Rauh, Jr., Stephen I. Schlossberg, Washington, D. C., Harriett R. Taylor, Benjamin Rubenstein, William S. Zeman, Hartford, Conn., on the brief), for intervenor.

Before SMITH, KAUFMAN and FEINBERG, Circuit Judges.

KAUFMAN, Circuit Judge:

The National Labor Relations Act (NLRA), conceived during the Great Depression and founded upon a frank recognition that our boom-and-bust economy was attributable in part to labor-management unrest, was designed to overcome the inequality of bargaining power between employees and employers. Moreover, the NLRA undertook to provide several methods for the peaceful settlement of labor disputes and the avoidance of disruptions and dislocations generated by strikes and other forms of industrial strife so harmful to our economy. See NLRA section 1, 29 U.S.C. § 151. At the heart of the statutory scheme was the duty, now imposed upon both sides, to bargain with each other "in good faith." NLRA sections 8(a) (5), 8(b) (3) and 8(d), 29 U.S.C. §§ 158(a) (5), 158(b) (3) and 158(d). But, that bargaining duty was not restricted to the negotiation and execution of labor-management agreements; it encompassed post-contractual obligations as well, such as the good faith day-to-day administration of the grievance procedures the parties created for the settlement of their disputes. See United Steelworkers of America v. Warrior and Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). Generally, the National Labor Relations Board (Board) and the Courts have abstained from interfering with the conduct of this dispute-resolving machinery; but, there are occasions, as in the case before us, where we are compelled, in the interest of avoiding the dissension which flows from uncertainty, to set forth guidelines or place our imprimatur on procedures sought to be utilized.

## I.

This case is before us on cross-petitions for review and enforcement of an order of the Board directing the Fafnir Bearing Company (Company) to permit the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Local 133, UAW, AFL–CIO (Union) to conduct independent time studies at the Company's plant for the purpose of determining whether the Union should accept certain proposed piece rates or proceed to arbitration, the final step in the grievance procedure. The Union, which filed the underlying charge, has intervened in this proceeding.[1] For the reasons set forth below, we deny the petition for review and enforce the order of the Board.

The factual setting which gave rise to this proceeding is, in the main, undisputed. Many of the essential facts were stipulated; and, as to other facts, we find substantial evidence to support the findings of the trial examiner and the Board. See N. L. R. B. v. Universal Camera Corp., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

The Company operates a production plant in New Britain, Connecticut which manufactures ball bearings and related products. Since 1944, the Union has represented the Company's production and maintenance employees in periodic negotiations concerning wages, hours and working conditions. According to the pertinent provisions of the contract executed in February 1962, wages are paid pursuant to what is commonly termed a "piece rate system." This method of compensation is designed to provide employees with an incentive to maximize their productivity. Its basic operation is not complex. A time study is conducted by an industrial engineer to determine how many units per hour an average employee working at a normal pace can produce. This figure is called the "standard." Workers who turn out less than or as much as the standard receive a minimum wage. But, the conscientious and resourceful employee, who so desires, can increase his rate of pay by raising the level of his production. If, for example, he produces double the units specified in the applicable standard, he will receive twice as much compensation as his less ambitious colleague.

There is, however, no demonstrably accurate method for setting "standards"; and, as can be readily predicted, this area is a fertile source of disputes requiring invocation of the Company-Union grievance machinery. Indeed, considering that the Company has established over 10,000 new piece work prices each year, the number of grievances to which they gave rise was relatively modest. In 1961, there were 86 piece rate grievances; in 1962, the corresponding figure was 47; and in the first half of 1963, 33 such grievances were filed.

The governing agreement established only general guidelines as to how "standards" were to be formulated. Section 8.4 provided, *inter alia*, that piece work prices "shall be set so that the average qualified operator working under normal job conditions and applying normal incentive efforts shall be able, after a reasonable trial period, to earn 5% above the standard earning rate of his labor grade (as indicated in the schedule initialled by the parties)." Subsection 8(a)(4) authorized a piece rate revision only when "there has been a measurable change or accumulation of changes over a period of time in material, method or processes not previously taken into account in setting the price * * *"

On various dates prior to February 1963, the Union filed grievances[2] claiming that certain piece work prices were improperly established by the Company and did not conform to Section 8.4 of the

---

1. See International Union, United Automobile, etc., Workers v. Fafnir Bearing Co., 382 U.S. 205, 86 S.Ct. 373, 15 L.Ed.2d 272 (1965).

2. These four grievances numbered 62–79, 62–114, 62–161 and 62–187, related to proposed piece rates for jobs involving the Company's manufacturing process.

governing agreement. After unsuccessfully utilizing the first two steps of the Company-Union grievance machinery, key representatives of the Company and the Union met on February 7, 1963, at the third stage of the grievance procedure. At this meeting, the Union requested all time study data which the Company had utilized in setting the piece rates which had prompted the grievances and the Company furnished all the relevant information in its possession. Kermit K. Mead, Director of the Time Study and Industrial Engineering Department of the Union's parent International, the United Automobile Workers, examined this material during a recess, and upon reconvening, proceeded to question Company representatives about the data supplied. Dissatisfied with the responses, particularly because the Company could not account for a 5% "adjustment factor," Mead requested permission to conduct his own time study of the operations involved so that he could verify the Company's proposed rates and intelligently advise the Union whether to accept them or invoke arbitration—the fourth and final step of the grievance machinery. The Company refused this request on three principal grounds: (1) such study was unnecessary for the Union to determine whether to seek arbitration; (2) the governing agreement did not authorize the Union to conduct independent time studies, and (3) in any event, the Union's rights were adequately protected because the arbitrator would conduct his own studies as he had in the past.[3]

When the Union filed the underlying charge with the Board, a complaint issued alleging, *inter alia,* that the Company had refused to bargain in good faith as required by section 8(a) (5) of the Act. Thereafter, a full hearing was held before a trial examiner who found as a fact that Mead was unable to determine "from the data set forth in the Company's studies whether the piecework rates were established in accordance with the contract, and, therefore, was unable to advise the Union whether to request arbitration." Despite this finding, the examiner believed he was constrained to recommend that the complaint against the Company be dismissed because, *inter alia,* he was "unable to find any present compelling authority * * * which sanctions the view that a union is entitled to make its own independent time studies after it has received the employer's time study records." The Board[4] endorsed its examiner's findings of fact[5] but rejected his conclusion. In a determination attacked here by the Company, the Board held that sections 8(a) (1) and 8(a) (5) were violated when the Company refused to grant the Union access to its plant for the purpose of conducting an independent time study of the disputed operations.

## II.

A threshold question must be determined by us. Contending that principles of *stare decisis* should control the outcome of this proceeding, the Company maintains that the decision of the Board is directly contrary to this Court's holding in N. L. R. B. v. Otis Elevator Co., 208 F.2d 176 (2d Cir. 1953). While it is true that in *Otis,* a per curiam opinion (Judge Clark vigorously dissenting), we

---

3. It is not without significance that at this early stage of the proceedings the Company did not urge that Union conducted studies would be disruptive of plant discipline. Indeed, it was not until a month after the Board rendered its decision that the Company moved for leave to reopen the record "to introduce expert testimony from a qualified industrial engineer" to establish, *inter alia,* that "access to [the Company's] plant by a Union industrial engineer would unduly interfere with production and operations." The Board

denied this motion (Leedom, member, dissenting) on the ground that the evidence had been available at the time of the hearing.

4. Leedom, member, dissenting.

5. The Board found "that the information which the Union sought to obtain by means of time studies was not only relevant but also necessary to enable the Union to make an intelligent decision whether to proceed to arbitration."

**720**

declined to enforce that portion of the Board's order directing a company to permit a union to conduct an independent time study which the union sought for the purpose of assessing the accuracy of proposed piece work prices, we believe *Otis* is distinguishable in at least two vital respects. First, the company in *Otis* not only refused to permit the union to make a "live" study, but, rejected outright the union's request for whatever data the company had in its possession.[6] Thus, *Otis* reached this Court on a sparse record. Neither the trial examiner nor the Board had been afforded an opportunity to analyze the Company's time study material. Consequently, no determination had been made as to whether this data alone would have been sufficient for the union to make an informed judgment to accept the company's proposed rates or seek arbitration. Second, and even more significant, this Court in *Otis*, on the relatively skimpy record before it, concluded that whatever additional information the union sought could have been obtained merely by interviewing its members. In view of this circumstance, the Court determined that no "invasion of respondent's plant" was necessary. 208 F.2d at 177.

Seizing upon this language, the Company urges that in the instant case, the Union had alternative sources for the information it sought and therefore did not really require independent time studies. But, there was ample evidence before the trial examiner and the Board to justify the rejection of this contention out of hand. Mead testified in detail as to the absolute need for a "live" time study stating that without it the Union could not make an informed judgment on the Company's proposed rates. The testimony of Mead and Bertram Gottlieb, Staff Industrial Engineer of the AFL–CIO, also gave the trial examiner a full view of how time studies were generally made: Piece work prices were established by a ratesetter (usually an industrial engineer) on the basis of a combination of subjective and objective factors. Preliminarily, the ratesetter examined the place where the work was performed and noted environmental factors such as heat, light and other conditions which might have a bearing on productivity. He then reduced the particular job under study into its component parts, designated "cyclic" and "non-cyclic" elements. Cyclic elements were those performed in the production of every unit; non-cyclic elements comprised factors such as going to the lavatory, consulting with the foreman or getting stock from a storage area. Next, the ratesetter observed several operators performing their jobs and made a record of the "actual performance of the job in terms of the motion pattern used." If the ratesetter believed that a particular employee under examination was above or below average pace, he would "normalize" the performance by adjusting the actual timing of the job upward or downward. He then added an allowance, based upon his personal observation and judgment, for "personal fatigue and delay," and other elements of the job.

Mead testified, as we have indicated, that he could not assess the accuracy of the Company's studies without making his own investigations. As illustrative, he noted that with respect to one of the piece rates which was the subject of a grievance the Company had employed a normalizing factor of 90%. But, without conducting his own study, Mead had no way of determining whether this adjustment was appropriate. The record is replete with numerous similar examples. Based upon all the testimony with respect to the need for "live" studies, we believe that unlike *Otis*, there was substantial evidence in this record to support the Board's finding that Union-conducted "live" studies provided the only means for full assessment and verification of the Company's proposed rates.

### III.

The Company argues, in the alternative, that section 8(a) (5) does

---

**6.** Indeed, in *Otis*, we enforced that portion of the Board's order requiring the Company to make this information available to the Union.

not encompass refusals to admit Union representatives to plant facilities for the purpose of conducting "live" studies. The Company points out that it has already turned over to the Union all of its time study data and suggests that by so doing it has fulfilled its obligation to bargain in good faith. This contention presents the most troublesome issue for our decision. An employer's duty to provide relevant information to union representatives so that they can effectively bargain on behalf of their members has been established beyond question. See N. L. R. B. v. Truitt Mfg. Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956); N. L. R. B. v. Whitin Mach. Works, 217 F.2d 593 (4th Cir. 1954), cert. denied, 349 U.S. 905, 75 S.Ct. 583, 99 L.Ed. 1242 (1955); N. L. R. B. v. New Britain Mach. Co., 210 F.2d 61 (2d Cir. 1954); N. L. R. B. v. Jacobs Mfg. Co., 196 F.2d 680 (2d Cir. 1952); N. L. R. B. v. Yawman & Erbe Mfg. Co., 187 F.2d 947 (2d Cir. 1951). And, it is true that by turning over its own time study data, the Company believed it had complied with all that was required of it under the Act. The issue confronting us, however, is whether in the circumstances presented here, the Company in fact was required to take that next step and grant permission to the Union to make a live study so that it could reliably evaluate the Company's data. While it is true that the material the Union sought, because of its subjective nature, was not in the Company's filing cabinets, it was nevertheless within the Company's exclusive control, cf., N. L. R. B. v. Item Co., 220 F.2d 956 (5th Cir.), cert. denied, 350 U.S. 836, 76 S.Ct. 73, 100 L.Ed. 746 (1955). Consequently, on the evidence and findings presented in this proceeding, we believe the Board, exercising its expertise and special competence, could properly determine that the Union's need to conduct these tests outweighed the Company's interests in closing its doors to outsiders. Cf. Republic Aviation Corp. v. N. L. R. B., 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). Of course, we are not to be understood as saying that if the Company had established that Union-conducted studies would have severely disrupted production, see Note, 17 Stan.L.Rev. 507 (1965), we would not have a significantly different case; but, we shall defer judgment on such a situation until another day. Here, however, the major inconvenience which the Company asserted was that some of its employees might have been distracted when Union studies were being conducted. But, in the context of this case we find little merit in this contention. The workers were, after all, on a piece rate system and, except for a fixed minimum, were paid on the basis of what they produced. Moreover, a time study to be accurate must be conducted under normal conditions and thus to a certain extent is its own guarantor of minimal interference with production or discipline.

It is also urged that since the arbitrator was authorized to conduct his own studies, what the Union sought here was merely duplication of effort; thus, the Company's restrictive view of Section 8(a) (5) should prevail. But, this argument misses the mark. The reason the Union desired to make "live" tests was not to usurp the function of the arbitrator and thereby interfere with standard grievance procedures; it was needed, instead, to determine whether to take the grievances to arbitration in the first place.[7] By preventing the Union from conducting these studies, the Company was, in essence, requiring it to play a game of blind man's bluff. Only by guess-work could the Union determine which piece rates to protest and which to accept. Of course, the Union always had the option of demanding that *all*

---

7. The Union's brief states (emphasis omitted):

"More than 2400 disputes arising in the grievance process were time-studied by the UAW [Time Study] Department between 1962 and 1965; and of these grievances the Union found 50 percent unjustified and necessary of abandonment, while 99 percent of the remainder were adjusted with the employers without the necessity of invoking arbitration."

grievances on proposed piece work prices be reviewed by the arbitrator; but that alternative obviously would be impractical, expensive and indeed strife-breeding, considering that there were over 10,000 new proposed rates each year. Thus, if the Company-Union grievance machinery was to work smoothly, it was essential that the Union obtain the information necessary for a considered judgment.

■ Nor are we persuaded that the Board's decision unduly invaded the Company's property rights. In other circumstances, the courts have not hesitated to afford union representatives access to company premises in furtherance of the Act's purposes. See N. L. R. B. v. Stowe Spinning Co., 336 U.S. 226, 69 S.Ct. 541, 93 L.Ed. 638 (1946) (union granted access to company town to hold organizational meeting); N. L. R. B. v. Lake Superior Lumber Corp., 167 F.2d 147 (6th Cir. 1948) (union granted access to company-owned logging camp to solicit membership); N. L. R. B. v. Cities Service Oil Co., 122 F.2d 149 (2d Cir. 1941) (union granted access to company ship to discuss grievances with unlicensed personnel). Similarly, the distinction urged by the Company between affording employees access to the production areas of the plant while limiting non-employees to the non-production areas, cf. N. L. R. B. v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956), has little merit in a case such as this. It would be a rare coincidence where an employee happened to be also a qualified industrial engineer and could adequately conduct time studies on behalf of his union. Moreover, it is apparent that these studies must be made in the production areas of the plant; they are designed, after all, to measure productivity under normal and usual circumstances. Thus, adopting the Company's suggested distinction would foreclose all Union-conducted time studies, a step which, as already indicated, we believe contrary to the purposes Congress intended the Act to serve.

■ Equally without merit is the Company's argument that the failure of the governing agreement to specifically provide for independent time studies is dispositive of this proceeding. While it is true that the Union had not requested permission to make these tests in the past, we do not find that determinative. Our main concern here is with statutory rights. Thus, the agreement did not expressly prohibit union-conducted studies and its silence in these circumstances cannot be construed as a "clear and unmistakable" waiver. See N. L. R. B. v. Perkins Mach. Co., 326 F.2d 488, 489 (1st Cir. 1964).

IV.

■ Finally, the Company urges that the Board's order is too broad. In pertinent part, the order directs the Company to permit the Union to perform "independent time studies through its own experts on jobs involved in grievances arising under [the] * * * collective bargaining agreement." The Company insists that this language authorizes the Union to conduct a fishing expedition in the Company's plant. But, the order is to be read in the light of this opinion and that of the Board's. Generally, as we have already indicated, independent time studies should be authorized only when essential for the union to function intelligently in behalf of employees and only when such studies will not unduly disrupt the productive operations of the company. We do not refute the argument that access to company property for the purpose of conducting these studies could be employed by the unscrupulous as a tool of harassment. But such is not the case here. And, we are confident that the Board will perform its traditional function of balancing carefully the respective interests on both sides in cases where the need for time studies is disputed.

Order enforced.[8]

8. In the context of this case, we agree with the Board's conclusion that the evidence establishing a violation of section 8(a) (5) also disclosed a violation of section 8(a) (1).