**GENERAL ELECTRIC COMPANY,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent.

No. 12865.

United States Court of Appeals
Fourth Circuit.

Argued April 10, 1969.

Decided June 12, 1969.

As Amended on Denial of Rehearing
Aug. 28, 1969.

---

9. *See* Riley v. District of Columbia Redevelopment Land Agency, 100 U.S.App.D.C. 360, 246 F.2d 641 (1957), en banc.

William W. Sturges, Charlotte, N. C. (Robert L. Grant, New York City, and Weinstein, Waggoner, Sturges & Odom, Charlotte, N. C., on brief), for petitioner.

Seth D. Rosen, Atty., N.L.R.B., (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Nancy M. Sherman, Atty., N.L.R.B., on brief), for respondent.

Robert Friedman, Washington, D. C. (Irving Abramson and Ruth Weyand, Washington, D. C., on brief), for intervenor.

Before HAYNSWORTH, Chief Judge, and WINTER and CRAVEN, Circuit Judges.

WINTER, Circuit Judge:

On petition to review and set aside and cross petition to enforce an order of the Board, we must determine if General Electric violated §§ 8(a) (5) and 8(a) (1) of the Act, as the Board found, by refusing (a) to permit the union's time study engineer to conduct independent time studies of production standards involved in grievances and alleged by the union to be inaccurate, (b) to permit the union's time study engineer to inspect General Electric's time study data, (c) to permit the union's time study engineer to conduct independent evaluations of jobs by personal observation when the jobs were involved in grievances arising from the allegation that they had been improperly evaluated, and (d) to supply the union with a copy of an area wage survey prepared by General Electric and used as a basis

for wage adjustments which gave rise to grievances. General Electric Asserted before the Board, and asserts before us, that the requested information was irrelevant to any legitimate purpose for which the union may properly seek information and that the union waived any rights to the information which it might otherwise have had in the provisions of the collective bargaining agreement between the parties and the negotiations leading thereto. We conclude that the Board's order should be enforced.

I

General Electric and the union are parties to a collective bargaining agreement applicable to approximately 750 hourly rated production and maintenance employees at General Electric's plant in Hickory, North Carolina, where General Electric manufactures distribution transformers. Coil winders, who perform an essential step in the manufacturing process conducted at this facility, are subject to production standards established by time studies made pursuant to a General Electric system, known as "Motion Time Study (MTS)." This system involves the use of predetermined time values for body motions and movements.

The contract between the parties established a three-step grievance procedure. Any grievance is first considered by the shop steward and the foreman of the department involved, next by local management and local union officials, and, finally, by General Electric officials and national union officers. Certain unsolved grievances, such as those challenging disciplinary action against employees, are subject to compulsory arbitration; other grievances, such as over the setting of production standards are subject to voluntary arbitration.

Over a period of time the union initiated various grievances raising questions as to whether the MTS system applicable to a certain operation was being improperly used for another operation, whether insufficient time was allotted for various coil winding operations, whether disciplinary notices for consistent failure to meet production standards were unjustified because based upon inaccurate time studies, and whether the removal of Charles Rollins, a trainee, from his coil winding job was without just cause because the time standards were incorrect. These various grievances were considered at various stages of the grievance procedure established by the contract, but despite the union's dissatisfaction with their resolution, were not carried to the next higher stage because of the union's claim that it lacked sufficient information and data effectively to participate for its members. Throughout, the union took the position that it should be allowed to have a time study engineer come into the plant to make his own studies and that he should be present when time studies were made by General Electric. While General Electric offered to permit the union (but not its expert) to examine General Electric's time study data, including motion pitcures of General Electric's retiming of certain disputed production standards, General Electric steadfastly refused to permit the union's time study engineer to conduct independent time studies of production standards involved in grievances, or to permit the union's time study engineer to be present when General Electric's time study engineer retimed certain disputed production standards. General Electric did, however, review its disputed time standards and increased time allowances in some instances. It was the position of the union that it could not intelligently represent its members involved in grievances without the independently arrived at data it sought to develop, while it was the position of General Electric that the setting of production standards was a responsibility and prerogative of management, that the presence of a union engineer at General Electric's retiming of disputed production standards would have a disruptive effect, and that the data which General Electric was willing to make avail-

able to the union was sufficient to enable the union to determine if General Electric's MTS system had been properly developed and was being properly applied.

With regard to General Electric's area wage surveys, it appears that General Electric set hourly rates at the Hickory plant by means of a job evaluation system, consisting of twelve factors, each of which is subdivided into six degrees. Each degree has a number of points assigned to it, and the total number of points is applied to a point scale to obtain a job rating code number. This number, applied to a wage scale, yields the hourly rate. The scale of hourly rates, was based in part on information obtained by General Electric through area wage surveys.

When the union filed grievances claiming that certain jobs were rated too low, General Electric asserted that the wage rates for these jobs were greater than the rates paid by other employers in the area. The union then requested access to the plant to observe the jobs, and requested that General Electric furnish the names of the companies it used in making area wage rate surveys on the various jobs compared at each plant. General Electric refused access to the plant, and offered to prepare a chart showing the names of the companies and the jobs included in the area wage surveys, without, however, identifying the company with the job.

The trial examiner determined that the union was entitled as a matter of statutory right to the information it requested to be obtained in the manner that the union demanded, but that the union had waived its right to have its time study engineer conduct independent time studies of production standards involved in grievances, and the right to conduct independent evaluations of jobs by personal observation. He, therefore, recommended that General Electric be determined to have violated § 8(a) (5) of the Act by its refusal to permit the union's industrial engineer to inspect the company's time study data. As to the area wage survey, the trial examiner

found that General Electric had violated the Act by refusing to furnish the union with the names and jobs of companies in the area that it had surveyed.

Where the trial examiner had found a violation of the Act, the Board adopted his report. It, therefore, affirmed the trial examiner with regard to the right of the union's time study engineer (as distinguished from the union unaided by an expert) to inspect General Electric's time study data. However, the Board reversed on the issues of independent time studies and evaluations by means of personal observation, concluding that the union had not waived its rights by the collective bargaining contract to which it agreed, considered alone, or in the light of the negotiations preceding a meeting of the minds on that contract.

II

██ We think that there was substantial evidence to support the finding that in order intelligently to participate in the grievance procedures established by the contract the union should be given the opportunity to conduct independent time studies of production standards, have its expert inspect General Electric's time study data, and have its expert conduct independent evaluations by personal observation. This finding is well grounded in the uncontradicted testimony of a qualified industrial engineer that he could not tell, with respect to the coil winding operations in issue, from the MTS alone whether the standards thereby prescribed would be fairly and equitably applied in a given case because the MTS contained references to certain work elements not defined in the document itself and other work elements were not described in sufficient detail. Each type of physical movement under MTS has certain definitions and certain characteristics, and one analyzing MTS must use a combination of what he sees and what he knows in order to determine what time allowance should be applied to a particular movement. The engineer's testimony continued to the effect

that a person analyzing MTS must make other subjective judgments, such as whether two or more bodily movements should be considered to be capable of performance simultaneously and how much "retarded" time must be allowed when movements cannot be performed normally. Indeed, the MTS manual itself points out that hard and fast rules cannot be formulated, and the only way in which they can be analyzed is by having the analyst exercise his judgment in applying time for retarded movement. For these reasons, the engineer concluded that he could not advise the union on the adequacy of the coil winding specifications without observing the job as it is being performed, under the working conditions that exist and under the methods that were being used.

The engineer also testified that if he were authorized to make a time study at the plant on the coil winding specification he had examined it would be necessary for him to observe the operator performing the work, noting significant interruptions in the work to determine if the employee was in fact meeting the General Electric standard. If he found that the standard could not be met by a normal operator working at a normal pace he would check General Electric's MTS analysis data to see if the operator was in fact following the method on which the standard was based.

Should he be unable by inquiry and the steps previously described to determine that particular work elements were allotted insufficient time, he would undertake a stopwatch time study and that study would be of work elements and not of the several motion elements which would normally go into the performance of a work element.

Overall, the engineer testified that all standards are strictly a question of judgment, and no engineer can "prove" a standard is right or wrong. Moreover, whether an operator can meet a standard by working at a normal pace is strictly a subjective determination, arrived at as a result of the engineer's training and experience. The minimum training to qualify an engineer in the field is a bachelor's degree, including courses in industrial psychology, physiology and various mechanical subjects.

At the risk of being redundant, it is manifest that this summary of the engineer's testimony fully supported the conclusion that " * * * the Union could not make an intelligent decision on how far to press employee grievances challenging the Company's time standards without the advice of an expert based on his actual observation of the operations in question and an opportunity to check his observations, including time studies, against the Company's MTS data."

The conclusion we reach is fully in accord with Fafnir Bearing Company v. NLRB, 362 F.2d 716 (2 Cir. 1966) (quoted with approval in NLRB v. Acme Industrial Co., 385 U.S. 432, 438 n. 8, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967)), where, unlike the present case, the company provided the union's time study engineer with its time study data, but refused to permit the union to conduct "live" studies for assessment and verification of the company's proposed piece rates. In enforcing the Board's decision because it concluded "that the Union-conducting 'live' studies provided the only means for full assessment and verification of the Company's proposed rates" (362 F.2d at 720), the Court expressed the rationale of its decision as follows:

"An employer's duty to provide relevant information to union representatives so that they can effectively bargain on behalf of their members has been established beyond question. See N.L.R.B. v. Truitt Mfg. Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956); N.L.R.B. v. Whitin Mach. Works, 217 F.2d 593 (4th Cir. 1954), cert. denied, 349 U.S. 905, 75 S.Ct. 583, 99 L.Ed. 1242 (1955); N.L.R.B. v. New Britain Mach. Co., 210 F.2d 61 (2d Cir. 1954); N.L.R.B. v. Jacobs Mfg. Co., 196 F.2d 680 (2d Cir. 1952); N.L.R.B. v. Yawman & Erbe Mfg. Co., 187 F.2d 947 (2d Cir. 1951). And,

it is true that by turning over its own time study data, the Company believed it had complied with all that was required of it under the Act. The issue confronting us, however, is whether in the circumstances presented here, the Company in fact was required to take that next step and grant permission to the Union to make a live study so that it could reliably evaluate the Company's data. While it is true that the material the Union sought, because of its subjective nature, was not in the Company's filing cabinets, it was nevertheless within the Company's exclusive control, cf., N.L.R.B. v. Item Co., 220 F.2d 956 (5th Cir.), cert. denied, 350 U.S. 836, 76 S.Ct. 73, 100 L.Ed. 746 (1955). Consequently, on the evidence and findings presented in this proceeding, we believe the Board, exercising its expertise and special competence, could properly determine that the Union's need to conduct these tests outweighed the Company's interest in closing its doors to outsiders." 362 F.2d at 721.

Accord: Waycross Sportswear, Inc. v. NLRB, 403 F.2d 832 (5 Cir. 1968). See also, Alba Waldensian, Inc. v. NLRB, 404 F.2d 1370 (4 Cir. 1968), where we enforced without comment the Board's order requiring the employer to allow the union to make its own time studies of piece rates on the theory that such refusal was a violation of § 8(a) (5).

The only limitation on the scope of the *Fafnir* rule suggested in the opinion in that case is the caveat that each case requires a weighing of the union's need to make the studies balanced against any inconvenience which might be caused to the company in the process, or the violation of any right of privacy that the company may possess. In the case at bar, there is no serious suggestion that the studies in question would interfere with production, nor can we say that the prerogatives of management to the private conduct of its business should outweigh the union's demonstrated need to the information and inspections that it sought to enable it to administer its interest and the interest of its employees in and under the contract to which it had agreed. In this connection, we are, of course, influenced by the strong public policy to make the grievance procedures established by the parties the means for accomplishing industrial peace. See, *e. g.*, United Steel Workers of America v. Warrior and Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). Access to the information to make them fully effective is in the interest of an enlightened employer, as well as the union.

### III

We agree with the Board that, considered alone, or in the light of the negotiations from which the contract emerged, the union did not waive its statutory right to discovery in its agreement with General Electric. At the outset, we recognize the established canon that while a union may waive its statutory right to information relevant to the processing of grievances, only clear and unmistakable language will warrant a conclusion that waiver was intended. See, *e. g.*, Fafnir Bearing Co. v. NLRB, *supra*, 362 F.2d at 722; Timken Roller Bearing Co. v. NLRB, 325 F.2d 746, 750–751, 2 A.L.R.3d 868 (6 Cir. 1963), cert. den., 376 U.S. 971, 84 S.Ct. 1135, 12 L.Ed.2d 85 (1964). In the *Timken* case, which dealt with the counterpart of one of the arguments advanced here, the union demanded certain wage information from the employer. The employer refused the data on the theory that the matter had been discussed in the course of contract negotiations, the union's demand that certain explicit provisions relating thereto be included in the contract had been rejected and the final contract was silent on the subject. The employer's claim of waiver was rejected in the following language:

"This reasoning would probably be applicable if the right or benefit sought by the Union was a right or benefit which could only be acquired by virtue of the bargaining agree-

ment. Under such circumstances a failure to include it in the agreement necessarily results in a failure to acquire it. * * *

However, in this case we agree with the Board that the Union's right to wage information it needed to administer the bargaining agreement was a right which it had under * * [the Act], and the existence of this right was not dependent upon it being included in the bargaining agreement." 325 F.2d at 751.

Specifically, we find no waiver in Article VI § 4(e) of the contract which permits a union steward to have notice and be present when a company representative makes a time study of hourly rated piece workers, because the employees in regard to whose grievances the union sought the requested information are hourly workers and not piece workers. Article XIII § 2(b) (2) permits, where there is mutual agreement, a joint company-union inspection of a job where an inspection would be helpful in settling a grievance, but this provision, too, does not constitute a waiver. Such a bilateral inspection as part of the second step in the grievance procedure serves a different purpose than does the union's unilateral compilation of the information it requested for the purpose of evaluating the grievance and determining upon future action. Unions, as well as employers, may act reasonably, and obtention of the information sought may well lead the union to refuse to process a grievance or to agree to a settlement at an early stage of the grievance.

■ We think that Article XIII § 2(b) (2) has no greater effect when the negotiations preceding its current statement are examined. Briefly stated, the evidence shows that, in 1966, the union pointed out during contract negotiations that General Electric was refusing to permit the union to have its own time study engineer investigate grievances involving production standards at the Hickory plant. When General Electric asserted that the contract did not provide

for such rights, the union's attorney stated that the union did not need any provision giving it such a right in the contract, because the right was a statutory one and the union intended to exercise it. The union attorney also called attention to the *Fafnir* case. Shortly thereafter, a union attorney filed an unfair labor practice charge which alleged that General Electric had violated the Act by refusing to allow the union access to its Hickory plant to make studies related to the processing of grievances. Clearly, therefore, the union did not consciously yield, or clearly and unmistakably waive, its interest in the matter. The mere fact that it executed a contract which did not include its request for a contractual guarantee of its statutory rights did not constitute an effective waiver of them. Timken Roller Bearing Co. v. NLRB, *supra.*

Finally, we find no waiver in the "wrap-up" clause of the contract, which recited that it and related documents constituted full settlement of all issues which were the subject matter of collective bargaining between the parties and, as a result, that each of the parties agreed that none of such issues shall be subject to collective bargaining during the term of the contract. This provision merely purports to excuse, during the term of the contract, each party from any statutory duty to comply with the other's request to enter into negotiations with respect to any such issue about which the parties had bargained in precontract negotiations. This provision left the parties' respective rights to demand or refuse grievance data to the remaining provisions of the contract, which we have concluded did not effectively waive the union's statutory rights to such data. International Union of Electrical, Radio & Machine Workers v. General Electric Co., 332 F.2d 485, 489–490 (2 Cir.), cert. den., 379 U.S. 928, 85 S.Ct. 324, 13 L.Ed.2d 341 (1964).

IV

■ The correctness of the Board's requirement that General Electric supply

the union with the area wage survey data on which it relied need not be belabored. The data collected by General Electric was that which it relied on, in part, to set hourly rates. General Electric claimed that based upon this data the employees involved in wage grievances were not underpaid. Under such circumstances, it was incumbent on General Electric under § 8(a) (5) of the Act to disclose proof of the accuracy of its position. NLRB v. Truitt Mfg. Co., 351 U.S. 149, 152–153, 76 S.Ct. 753, 100 L.Ed. 1027 (1956); NLRB v. F. W. Woolworth Co., 352 U.S. 938, 77 S.Ct. 261, 1 L.Ed.2d 235 (1956) (per curiam); General Electric Co., Battery Prod., Cap. Dept. v. NLRB, 400 F.2d 713, 726 (5 Cir. 1968). See also, NLRB v. Whitin Mach. Works, 217 F.2d 593 (4 Cir. 1954), cert. den., 349 U.S. 905, 75 S.Ct. 583, 99 L.Ed. 1242 (1955). In our view, that proof was not disclosed when General Electric declined to furnish the union with the names and jobs of area companies it had surveyed.* Thus, it violated § 8(a) (5).

Enforcement granted.

---

* The trial examiner did not require, on the present record, General Electric to furnish a correlation of the names of the companies surveyed and a list of the jobs compared. The Board affirmed this portion of the trial examiner's decision without comment. We do not go beyond the information required to be furnished by the trial examiner and the Board in granting enforcement of the Board's order.