McGRAW–EDISON COMPANY,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Local 257, International Brotherhood of
Electrical Workers, AFL–CIO,
Intervenor.

No. 19429.

United States Court of Appeals
Eighth Circuit.

Dec. 4, 1969.

68

Paul S. Kuelthau, of Moller, Talent & Kuelthau, St. Louis, for petitioner and filed brief and reply brief.

John D. Burgoyne, Atty., N.L.R.B., Washington, D. C., for respondent; Arnold Ordman, Gen. Counsel, N.L.R.B., Dominick L. Manoli, Associate Gen. Counsel, N.L.R.B., Marcel Mallet-Prevost, Asst. General Counsel, N.L.R.B., and Robertamarie Kiley, Atty., N.L.R.B., were on the brief with Mr. Burgoyne.

Charles A. Werner, St. Louis, Mo., for intervenor; Gibson Langsdale, Kansas City, Mo., was on the brief with Mr. Werner.

Before BLACKMUN, GIBSON and BRIGHT, Circuit Judges.

BLACKMUN, Circuit Judge.

This case has its genesis in two complaints filed by the general counsel in 1966 against McGraw-Edison Company (Bersted Manufacturing Division). One complaint was based on charges by Local 257, International Brotherhood of Electrical Workers, AFL–CIO. The other rested on charges by Teamsters Local 833, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America.

McGraw seeks review of the resulting order of the National Labor Relations Board issued August 19, 1968, and reported as 172 NLRB No. 178. The Board, by cross-application, seeks enforcement of its order. The Board, in agreement with its trial examiner except for minor modifications not significant here, found that McGraw violated § 8(a) (1) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1), by numerous threats to employees for union activity, by threats to close down and move its Moberly, Missouri, plant if an organizational campaign succeeded, by interrogation of employees, and by granting wage increases and hospitalization benefits to discourage union activity. The Board also found that McGraw violated § 8(a) (3) and (1) by laying off 120 employees at its Moberly plant and delaying their recall, and by discharging two employees at its warehouse at Columbia, Missouri. Finally, the Board found that McGraw violated § 8(a) (5) and (1) by unilateral changes in incentive wage rates and by refusing IBEW permission to make time studies in the Moberly plant. The trial examiner had decided some issues in McGraw's favor.

The Board's order directs McGraw to cease and desist from the unfair labor practices so found; to permit IBEW, upon request and under reasonable terms and conditions, to perform its own time studies on incentive rated jobs; to offer the two Columbia employees reinstatement with full seniority rights; to make those two and the 120 Moberly employees whole for any loss suffered by them; to make available to the Board records necessary for an analysis of backpay due and rights to reinstatement; and to post appropriate notices.

Jurisdiction is established under § 10(e) and (f) of the Act, 29 U.S.C. § 160(e) and (f). This court granted IBEW permission to intervene on the side of the Board.

McGraw, through its Bersted Division, is engaged in the manufacture of electrical appliances at plants in Moberly, Boonville, Kirksville, Jefferson City, Macon, and Clarence, Missouri. It also maintains a warehouse at Columbia. In March 1966 IBEW initiated a campaign to organize the company's Missouri plants. On May 17 the union filed a representation petition with the Board. An election was scheduled and conducted at the Moberly plant on July 8. Prior to the election 120 second shift Moberly employees were laid off. IBEW won the election and on July 18 was certified as the bargaining representative of the Moberly production and maintenance workers. The record does not disclose that IBEW filed representation petitions at any other of the company's plants. Representatives of the company and of the union bargained between August 3 and November 4, 1966, but then recessed, without reaching agreement, pending the outcome of the unfair labor practice proceeding.

The Teamsters in their turn instituted an organizational campaign at the Columbia warehouse in September 1966. On October 3 it filed a representation petition. The Board conducted an election on November 7. The Teamsters lost by a vote of 7 to 2.

A. Restraint and coercion, in violation of 8(a) (1).

1. Threats. Section 8(c) of the Act, 29 U.S.C. § 158(c) provides,

"The expressing of any views, argument, or opinion * * * shall not constitute or be evidence of an unfair labor practice * * * if such ex-

pression contains no threat of reprisal or force or promise of benefit."

The Supreme Court has observed that the enactment of this provision "manifests a congressional intent to encourage free debate on issues dividing labor and management." Linn v. United Plant Guard Workers, 383 U.S. 53, 62, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966). And McGraw reminds us that the Ninth Circuit has said,

> "The mere fact that campaign propaganda may induce fear—and be intended to produce fear—does not deprive it of the protection of section 8(c). That is often the nature of campaign propaganda." NLRB v. TRW-Semiconductors, Inc., 385 F.2d 753, 760 (9 Cir. 1967).

The Sixth Circuit quoted this language with approval in Automation & Measurement Division v. NLRB, 400 F.2d 141, 145 (6 Cir. 1968). See also NLRB v. Herman Wilson Lumber Co., 355 F.2d 426 (8 Cir. 1966).

Accepting these statements and recognizing that labor and management, particularly during organizational campaigns, ordinarily "are allowed great latitude in freedom of expression, even to the extent of making predictions", NLRB v. Vinylex Corp., 404 F.2d 1200, 1201 (6 Cir. 1968), we nevertheless conclude that, on the entire record before us, the Board reasonably could find coercion by threats on the part of management. The trial examiner not inappropriately noted and credited numerous comments by supervisory and higher personnel at Moberly (Supervisor Burris to punch operator Taylor: "People don't know enough to leave well enough alone" and, if sufficient cards went in, "we will all be out of work, including me." Assembly foreman Johnson to three employees: "[T]hink twice about wearing * * * union pins because * * * things might be a lot different * * *." Supervisor Spicer to welder Branham: If the union got in, Branham might not have a job and the company might even move out. Supervisor Spotts to riveter Mary Jane Buckler: "What will you be doing a year from now if the union doesn't get in?" Buckler replied that she would probably be drawing unemployment. The response was that she could not draw unemployment for more than six months. Repairman Preston Buckler and physically handicapped employee Swanson were told by plant foreman McKee that a union victory could result in the loss of jobs because of age or health. Supervisor Vasper to employee Attebury: "Juanita, be careful how you vote * * *. Look, at our age it would be hard for us to get a job." Supervisor Wybert to welder Hunt: If the union won, "they would either just close us up or run" or "would keep cutting production until they finally had to close up." Supervisor Roberts to employee Winkler: "[T]hey could starve us out and start up with all new faces." Plant manager Ferguson to Moberly Chamber of Commerce manager Sanderson in the presence of employee Robb: "I am being told what to do"; if the union came in, "the plant would have to shut down.") and similar statements at other McGraw facilities in Missouri (Supervisor Roods to diecaster Boeckman at Jefferson City: "We are slowing [Moberly] down practically to nothing." Supervisor Chrisman to employee Linda Schilb at Boonville: If the union got in at Moberly, the plant would close and "we would lose our hospitalization insurance and our profit sharing." Supervisor Bates to employee Joe Schilb at Boonville: It is just a matter of time until Moberly moves out and closes down. Plant superintendent Yount to employees Selby and Rithcie at Macon: There was a possibility of Macon closing down if they went union; it would not cost the company to move; and the layoff at Moberly could happen at Macon).

McGraw would explain these remarks on the ground that they were made while the IBEW campaign was in full swing; that the employees felt no constraint at revealing their feelings about the union; that it was only natural for

supervisors to speak out when approached by employees; that the expressions for the most part were opinion; that the company had had a long strike at Fostoria, Ohio, with violence, and some of the statements are to be considered in the light of that fact; that many of the comments are those of only minor supervisory employees; and that the remarks were isolated.

■■ This is good argument, but at this stage of the case it is not persuasive upon us. The multiplicity of the statements, the fact that some are attributable to officials of high rank, and the nature of their content lead us to conclude that the general counsel sustained the burden of proving the interference test outlined in NLRB v. Link-Belt Co., 311 U.S. 584, 599, 61 S.Ct. 358, 85 L.Ed. 368 (1941), and in NLRB v. General Indus. Electronics Co., 401 F.2d 297, 300 (8 Cir.1968), namely, whether the statements taken in their setting are reasonably likely to restrain, and whether it may fairly be said that the employer is responsible for them. We regard them clearly as threats of reprisal which lie beyond the protection of § 8(c). NLRB v. Louisiana Mfg. Co., 374 F.2d 696, 702–703 (8 Cir.1967); NLRB v. Byrds Mfg. Corp., 324 F.2d 329, 332 (8 Cir.1963).

2. The Chamber of Commerce letter and two newspaper advertisements. The trial examiner and the Board found that McGraw had an obligation to disavow coercive aspects of a letter dated June 13, 1966, sent to Moberly employees of the company by Chamber of Commerce manager Sanderson [1] and advertisements placed in a Moberly newspaper on July 5 and July 7, respectively, by the "Committee to Retain Moberly Industry",[2]

1. The letter, on Chamber of Commerce letterhead and directed to "All McGraw-Edison Employees, Moberly, Missouri", read in part:

"Your production and attitude, combined with other assistance from your management staff, became a primary factor in the DuPont decision to eventually locate a plant here. DuPont was impressed that McGraw-Edison came to Moberly to escape labor disruptions and a prolonged strike in Fostoria, Ohio.

"Experience tells us that disruptions in the labor field within a community complicate small town industrial development and sometimes bring it to a halt. There are many instances just like Fostoria, where an unfavorable labor situation has resulted in industrial job opportunity deterioration. It has taken several years for our community history to dilute the factors involved in the loss of Brown Shoe, but industrial prospects still question us about that development.

\*   \*   \*   \*   \*   \*

"We would urge those involved in the field of labor relations to please weigh the full consequences including the impact on community development, before making future decisions. Let us continue to work together for a better community future!"

2. The first advertisement, headed "Industrial PEACE a Necessity", read in part:
"One has but to look back over the Moberly history of labor turmoil, to understand fully what it has cost our city in growth and progress. Two large payrolls have moved from Moberly in the past forty years, simply because employee organizations have used concerted action to make it difficult for these industries to operate efficiently, or to make that operation unpleasant, impractical, and non-competitive.

"Industry is not attracted to communities where industrial unrest is prevalent nor do they remain for an[y] length of time under such conditions. \* \* \*

" \* \* \* A large company has purchased the site for a new factory in Moberly, and will probably be very concerned about the outcome of the present union certification election pending at McGraw Edison. If this type of activity continues or spreads it could result in a change of plans for the location of this industry now on the way to Moberly.

"Past history has proved that Moberly has been most unfortunate in losing industries following labor problems. Our committee is concerned about keeping our good employers in Moberly, and getting new ones if possible. If we lose McGraw Edison, what will we have left?

"We hope that those engaged in the present election at McGraw Edison, will vote for continued employment, and the best interest of Moberly.

" \* \* \* The shutting down of the Brown Shoe Company in 1955 brought

and that, by failing to fulfill its duty to disavow, the company committed a § 8(a)(1) violation.

The Board argues that the letter and the advertisements echoed the threats made by the company's own officials that unionization would result in the shutdown and removal of the plant; that the Chamber and the committee had the same interest in defeating the union as did the company; and that the company had advance notice of both the letter and the advertisements.

McGraw asserts that the letter is a mere expression of opinion and is not coercive; that, being noncoercive, there can be no duty to disavow; that the reference to the Fostoria trouble was to a fact known to all employees; that the company was in no position to deny or contradict Sanderson's opinion; that IBEW had sufficient time (over three weeks) before the election to present its counter-arguments to the letter; and that the necessary agency relationship was absent. The company makes no assertion that the advertisements were not coercive.

We have dealt before with this question of agency in unfair labor practice disputes. The direction in § 2(13) of the Act, 29 U.S.C. § 152(13), that in de-termining whether any person is acting as an agent of another, so as to make the latter responsible for the former's acts, "the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling", is not without significance. This court gave impetus to this declaration in NLRB v. Arkansas-Louisiana Gas Co., 333 F.2d 790, 795 (8 Cir. 1964), when we said that, in determining responsibility in this area for the acts of others, "the principles of agency and its establishment are to be construed liberally." In Colson Corp. v. NLRB, 347 F.2d 128, 136-137 (8 Cir. 1965), cert. denied, 382 U.S. 904, 86 S. Ct. 240, 15 L.Ed.2d 157, we repeated the observation and upheld a finding that a separate corporation, officered by local businessmen, had acted in an agency relationship on behalf of the employer. We emphasized the company's awareness of their activities, the absence of an effective disavowal, and the agent corporation's prominence in persuading the employer to locate in the community. See also Amalgamated Clothing Workers v. NLRB, 125 U.S.App.D.C. 275, 371 F.2d 740, 743-744 (1966); NLRB v. Lake Butler Apparel Co., 392 F.2d 76, 79 (5 Cir.1968); Clarke v. NLRB, 410 F.2d 756 (4 Cir.1969).

about a critical unemployment situation, with resultant loss of business to Moberly institutions, and dislocation to many families of the Brown Shoe Company.

\*   \*   \*   \*   \*   \*

Will History repeat itself? Will Moberly citizens again be subjected to the following probl[e]ms as the result of losing a large payroll?

\*   \*   \*   \*   \*   \*

"The answer lies in the hands of those involved in the present McGraw Edison election. Let us hope that their decision is wise, and that industrial peace will continue in Moberly."

The second advertisement, headed "Why make Moberly a Test Case", read in part:

"The question of basic concern to all people in the Moberly area is whether the McGraw-Edison Company here will be closed or its production curtailed if a majority of the employees vote for the union this Friday.

"The Company has never said that the plant would close; it also has not said that it would stay open. Frankly we do not knew, and we don't think anyone else knows what will happen if the plant here goes union. There are six other McGraw-Edison locations nearby—none are unionized. \*   \*   \*

"We are convinced that the first plant to vote union will not be viewed with favor by the company. It would only be natural for them to make an example of the plant to keep others from doing the same thing. By the company's not agreeing to union terms a work stoppage could result at the Moberly plant that could last for years. Why let Moberly labor be used as a guinea pig for this?

\*   \*   \*   \*   \*   \*

"Why not adopt a 'Wait and See' policy? You can vote 'No' and let the other towns, that can better afford to lose industry, take the chance."

The resolution of this agency detail, on the overall record before us, is not of particular importance, for it bears on a § 8(a)(1) violation and we have already sustained the Board with respect to the threats aspect of the same issue. It is easy to conclude, as the trial examiner and the Board did, that the letter and the two advertisements fit the general picture and thus serve to buttress the unfair labor practice conclusion. Nevertheless, if the agency issue stood alone, we would hesitate to conclude that the letter and the advertisements, singly or in the aggregate, amounted to an unfair labor practice by McGraw. Neither Sanderson nor the committee had any official connection with the company. Neither the letter nor the advertisements purported to have its source with the company. The record reveals that the company's president did not know the identity of all the individuals comprising the committee; that no company official was on the Chamber board at the time the letter was sent out; that manager Sanderson asked McGraw for the names and addresses of its Moberly employees but was refused this information; and that it was stipulated that information sought in subpoenas issued to the newspaper and to a member of the committee "does not show that the advertisements * * * were paid for by McGraw-Edison * * * nor does it show any connection between the [company] and the individuals who in fact paid for said advertisements."

■ 3. Interrogations. These, too, in view of our holding as to the threats, assume no more than minor importance. The trial examiner and the Board found five instances of coercive interrogation by McGraw. Two of these were at Columbia. Each of the others was at a different plant. Having in mind the interrogation standards reflected in the opinions in NLRB v. Ritchie Mfg. Co., 354 F.2d 90, 99 (8 Cir.1966), and NLRB v. Ralph Printing & Lithographing Co., 379 F.2d 687, 690–691 (8 Cir.1967), we state merely that we conclude, on the record as a whole, that substantial evidence is lacking with respect to the Kirksville plant manager's single question inquiry of successful job applicant Orek as to whether she was for or against the union (her answer: "It didn't matter to me"), and with respect to Jefferson City supervisor Roods' inquiry of employee David Boeckman as to what happened at a union meeting the night before (the employee answered that he knew nothing about it and "didn't want nothing to do with it" and that he then left and "never said no more about it"). We reach the same conclusion with respect to conversations at Columbia between warehouse manager Vaughn and employees Dawson and Bortz. Dawson was instructed by five card signers to tell Vaughn of their signing. When he did this, Vaughn asked who the signers were. Dawson started to respond but Vaughn stopped him after one of the signers had been named and said that he did not want to know any more. Vaughn's inquiry of Bortz was whether he had an opportunity to sign a card and if he had done so; Bortz' response was that he had an opportunity to sign but had not signed.

■ We reach the opposite conclusion, however, with respect to Moberly assembly foreman Johnston's inquiry of the stepdaughter of employee Wolverton as to how her mother was going to vote in the election next day. Wolverton approached Johnston on election day and told him that she felt the question was a personal one, that she did not like it, and that he should not ask a child of hers such a question.

■ 4. Pre-election wage and hospitalization benefits. The conferring of economic benefits during a union's organizational campaign or pending a representation election, as an allurement for employees not to join a union, constitutes an unlawful interference with the employees' protected right to organize. NLRB v. Exchange Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964); NLRB v. Ralph Printing & Lithographing Co., supra, 379 F.2d at 691. A pre-election wage increase was given to

those Columbia warehouse employees who had not signed Teamster cards. The increase was announced on September 30, 1966, one day after employee O'Bryan revealed to company officials the identity of the employees who had signed cards and one day after the discharge of two of the card signers. Warehouse manager Vaughn testified that these were merit increases and that Bortz and Bonen, two signers who did not receive any increase, already had been given a merit increase on August 15. Theirs was the same increase as was given to four of the employees on September 30. The record does not indicate when the seven employees receiving increases had received their previous merit increase or whether it was company policy to give merit raises to all employees at the same time or to individual employees at different times.

■ The evidence supportive of the Board's finding was the timing of the increases, namely, their proximity to the company's first knowledge of the identity of the card signers and the discharge of two of those who had signed cards. On review here we cannot say that the record contains no substantial evidence to support this finding of the Board.

■ McGraw, in the week following the adverse election at Moberly, announced a $3 per day increase in its noncontributory hospital room benefit for all Missouri employees other than those at Moberly. The announcement stated, "Since the people in our Moberly plant have elected to have the I.B.E.W. Union represent them, we no longer can deal directly with them in matters of this type." The trial examiner and the Board found that this announcement of increased benefits was violative of § 8(a) (1) in view of its timing and of the company's pre-election statement that only it, and not the union, could increase hospitalization benefits, and in that "it was calculated to impress upon the Company's employees that the Moberly plant was not receiving the increased benefit in reprisal for going Un-

ion." The statement itself, of course, is not an incorrect statement of the law. However, on the entire record, we feel that the Board properly could infer that the reason was not the one stated but was "the suggestion of a fist inside the velvet glove." NLRB v. Exchange Parts Co., supra, 375 U.S. at 409, 84 S. Ct. at 460.

We thus uphold the finding that McGraw was in violation of § 8(a) (1) of the Act by the threats hereinabove described, by the interrogation of employee Wolverton, and by its conferring of the wage and hospitalization benefits.

B. Discriminatory layoff and discharge, in violation of § 8(a) (3) and (1).

1. The layoff at Moberly and the delay in recall there. On May 27, 1966, ten days after IBEW filed its representation petition, McGraw announced that it was laying off 115 employees on the second shift at Moberly. On May 31 five more Moberly employees were laid off. Recall began in August but it was October 5 before all these employees had been rehired or offered reinstatement.

The company explained that the layoffs were the result of a cutback in production of 20-inch breeze box fans and that this was necessary because of excessive inventory. As a part of this cutback, production of fans also ceased at the company's nearby (within 100 miles) Kirksville plant. However, in the latter part of June, due to an increase in orders, fan production was resumed at Kirksville. There was no increase in production at Moberly. The company gave a two-fold explanation for not increasing fan production at Moberly. The first reason was that Moberly was about to begin its vacation and Kirksville already had had its vacation. The second was that the company would use Moberly to produce appliances, particularly electric knives, which could not be manufactured at the other plants. Production of the appliances, however, was delayed because of the unavailability of parts and other difficulties. It is sug-

gested that the layoff should hurt, not help, the company in its labor controversies.

■ Again, we cannot say that the trial examiner's and the Board's conclusion, that the layoff and delay of recall of the Moberly employees was violative of § 8(a) (3) and (1), is unsupported by the record as a whole. We have (a) the timing of the layoff shortly after the filing of the union's representation petition, (b) the company's opposition to unionization, (c) the focus of that opposition at Moberly, (d) the threats, mentioned above, directed to the closing of the Moberly plant, (e) the fact that the layoff affected more than one-third of the Moberly employees, (f) the confinement of the layoff to Moberly, (g) the fact there was only one other layoff (in July 1958) of any size in Moberly's 14-year history, (h) the absence of warning or notice of the layoff, (i) attributing the layoff to cool weather and a decrease in fan orders with consequent excessive inventory, as contrasted with company policy to avoid layoffs by transferring duties, (j) the discontinuance of fan production at Kirksville without layoff there and, instead, a changeover to the production of heaters, (k) the consequent increase in heater inventory as contrasted with the year before, (l) hot weather in late June and a resulting increase in fan orders of such volume that inventory was depleted and fan production was reinstated at Kirksville, making it necessary to hire new employees there to cope with the increased workload, (m) the volume of fan production at Moberly and Kirksville, respectively, in the last half of 1966 as compared with the corresponding periods of 1965 and 1964, (n) Kirksville's ability to produce only a lesser amount of fan units in July than Moberly, even though on vacation for half the month, produced, (o) the failure of the announced increase in production of other appliances at Moberly to take place until long after the decision was made to transfer fan work away from Moberly, (p) the company's written announcement on May 24, 1966, to Moberly employees that "As to lay-offs, the Company can't avoid them, but we do try to keep them to a minimum by manufacturing to stock where we can", and (q) the company's subsequent announcement by similar letter dated June 23 to Moberly employees that inventory had been built up to excessive figures and "that the situation does not look good at this time unless there is a complete upward change in the demand for products made in this plant", in the face of the fact that, as McGraw's president conceded, "the orders [for fans] came in very heavy at the end of June and the first couple of weeks in July."

■ We apply to this plant layoff the same considerations which have application for discharges. The Board, of course, may base its finding on circumstantial as well as on direct evidence. Intent and motive are subjective and often may be proved only by circumstantial evidence. NLRB v. Melrose Processing Co., 351 F.2d 693, 698 (8 Cir.1965). Illegal motive has been held supported by a combination of factors, such as "coincidence in union activity and discharge", NLRB v. Council Mfg. Corp., 334 F.2d 161, 164 (8 Cir.1964); "general bias or hostility toward the union", NLRB v. Superior Sales, Inc., 366 F.2d 229, 233 (8 Cir.1966); variance from the employer's "normal employment routine", NLRB v. Melrose Processing Co., supra, 351 F.2d at 698; and an implausible explanation by the employer for its action, NLRB v. Harry F. Berggren & Sons, Inc., 406 F.2d 239, 245–246 (8 Cir.1969), cert. denied, 396 U.S. 823, 90 S.Ct. 64, 24 L.Ed.2d 74. See Mead & Mount Constr. Co. v. NLRB, 411 F.2d 1154, 1157 (8 Cir.1969), where Judge Heaney listed three applicable standards to be followed by trial examiners and the Board in the "confused area" of discharge cases, namely, that the general counsel has the burden of proving by a fair preponderance of the evidence that the employee was discharged for his union activities or membership, that is, but for his union activi-

ties or membership he would not have been discharged, that this burden can be satisfied by direct or circumstantial evidence, and that the Board may draw reasonable inferences and choose between fairly conflicting views of the evidence but cannot rely on suspicion, surmise, implications, or plainly incredible evidence.

There are too many factors present in this records for us to say, in the face of the decisions cited above, that there is no substantial evidence to support the Board's finding as to the Moberly layoff and delayed recall. See Textile Workers Union v. Darlington Mfg. Co., 380 U.S. 263, 275, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965).

2. The discharge of Columbia employees Snodgrass and Baldwin. Snodgrass was 19 years old when he started work for McGraw on August 15, 1966, as a truck unloader and order checker. Baldwin was only 17 when he was hired on July 6, 1966, to load and unload trucks. Both were discharged by warehouse manager Vaughn at the end of the workday on September 29. The discharges were prior to the expiration of their 90-day probationary period. Company witnesses testified to complaints about the work of Snodgrass and Baldwin by other employees who were union people. As a result of Snodgrass' failure properly to check orders, a few trucks had to be unloaded. It was said that he made stenciling errors and rode around on a forklift cart when it was needed elsewhere. The complaints about Baldwin were that he raced through the warehouse on an empty cart, and that he ran into pallets and the sprinkler system. He was taken off the forklift for a time so that he could watch its being operated by others. Thereafter he was returned to it. Vaughn testified that his work improved but then again regressed. Vaughn talked to Snodgrass about his work on two occasions in the two weeks before discharge but did not tell him he was in danger of losing his job.

Certainly, this record reveals that McGraw had cause to dis-

charge both Snodgrass and Baldwin. The existence of justifiable grounds for discharge, however, of itself does not preclude the finding of an unfair labor practice. NLRB v. Solo Cup Co., 237 F.2d 521, 525 (8 Cir.1956); Farmbest, Inc. v. NLRB, 370 F.2d 1015, 1018 (8 Cir.1967). There are in this record a number of facts adverse to McGraw's claim that the two discharges were for cause. The Columbia warehouse employed 12 men in September 1966. Between September 22 and 26 five employees, including Snodgrass and Baldwin, signed Teamster authorization cards. Manager Vaughn was notified on September 28 that five had signed. The following day president McDermott, in Vaughn's presence, asked employee O'Bryan what the trouble was with the employees. In the course of this conversation O'Bryan revealed the names of the card signers. That same day, a Thursday, the two young men were discharged. The company states that the reason the discharge took place on Thursday, rather than Friday, was because the work for the week was completed and only the checking of inventory by auditors from the division office remained to be done. There was no notice of the discharge. Vaughn states that it was not company policy to give notice; however, at least one day's notice of discharge had been given on a previous occasion. The record reveals no evidence of an incident immediately prior to discharge which can be pointed to as the immediate cause for termination. Although the issue is a close one, and although we as a trier of fact might well have decided otherwise, in the light of the factual context, of the pay increases given the next day, and of the coercive statements found to have been made by company officials, we must conclude again that the record contains evidence sufficiently supportive of the conclusion that these two were discharged in violation of § 8(a) (3) and (1).

C. Failure to bargain as to incentive wage rates and failure to allow time

studies, in violation of § 8(a) (5) and (1).

1. During the period in which representatives of the company and the union were engaged in bargaining, McGraw changed 17 existing incentive rates; it increased 10, decreased 4, and discontinued 3. Another was discontinued until a production difficulty was eliminated. These changes were made without notice to the union and without giving the union an opportunity to bargain about them.

An employer's unilaterally effected change in a condition of employment under negotiation is usually a violation of § 8(a) (5). NLRB v. Katz, 369 U.S. 736, 743, 82 S.Ct. 1107, 8 L. Ed.2d 230 (1962). So, too, is a unilateral change in an existing incentive system. NLRB v. C & C Plywood Corp., 385 U.S. 421, 424–425, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967). However, a unilateral change which is automatic and "in effect * * * a mere continuation of the status quo" is not violative of the statute. NLRB v. Katz, supra, 369 U.S. at 746, 82 S.Ct. at 1113. McGraw argues that the incentive rate changes here were designed to preserve the status quo because each rate was adjusted following a change in the job which would have increased or decreased the employee's wages under the old rate for that job or when production is low and "people aren't making what they should be making in the way of incentive earnings * * *." The company says that in those cases where a job was taken off the incentive system and the employee given base pay it was merely established policy.

We conclude that there is substantial evidence to support the Board's finding that not all the rate changes were the result of job changes. Some were made after a check of "past production records" revealed that the "rate was not enough to allow an operator to maintain his usual incentive earnings." Such a change was at the discretion of the company and was not automatic.

The company also concedes in its brief that the "discontinuance of an incentive rate may or may not affect an employee's earnings." To the extent the changes did not maintain the status quo, were not automatic and were at the company's discretion, McGraw was required to give the union the opportunity to bargain about them.

2. The Board also found that McGraw refused to permit the union to make its own time studies of Moberly plant jobs and that this was a violation of the Act. The company claims that this was error because (a) it was not charged in the original complaint or in the general counsel's response to an order for a more definite statement, (b) the complaint was not amended, and (c) the issue was not litigated.

Although the issue was not specifically pleaded, we conclude that it was litigated. There is evidence that the union requested permission to make the time study and that McGraw refused. This court has held that "a material issue which has been fairly tried by the parties should be decided by the Board regardless of whether it has been specifically pleaded." American Boiler Mfrs. Ass'n v. NLRB, 366 F.2d 815, 821 (8 Cir.1966); American Boiler Mfrs. Ass'n v. NLRB, 404 F.2d 547, 556 (8 Cir. 1968). And "There can be no question of the general obligation of an employer to provide information that is needed by the bargaining representative for the proper performance of its duties." NLRB v. Acme Indus. Co., 385 U.S. 432, 435–436, 87 S.Ct. 565, 568, 17 L.Ed.2d 495; NLRB v. Truitt Mfg. Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956). In Waycross Sportswear, Inc. v. NLRB, 403 F.2d 832 (5 Cir.1968), the court held that an employer's refusal to permit experts selected by a union to make time and motion studies within the plant constituted a § 8(a) (5) violation. See Fafnir Bearing Co. v. NLRB, 362 F.2d 716 (2 Cir.1966). We reach the same conclusion here.

Enforcement is granted.