567 F.2d 791
 97 L.R.R.M. (BNA) 2025, 82 Lab.Cas. P 10,249
 IOWA BEEF PROCESSORS, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
Local 222, Meat and Allied Food Workers Union, Amalgamated
Meat Cutters and Butcher Workmen of North America,
AFL-CIO, Intervenor-Respondent.
 No. 76-2050.
 United States Court of Appeals, Eighth Circuit.
 Submitted June 16, 1977.
Decided Dec. 13, 1977.
 
 William A. Harding, Lincoln, Neb., for petitioner; Terry E. Schraeder, Lincoln, Neb., on brief.
 Vivian A. Miller, Atty., NLRB, Washington, D. C., for respondent; John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Assoc. Gen. Counsel, Elliott Moore, Deputy Assoc. Gen. Counsel and William R. Stewart, Attys., Washington, D. C., on brief.
 Eugene Cotton, Chicago, Ill., for intervenor, Local 222, Meat and Allied Food Workers Union, Amalgamated Meat Cutters and Butcher Workmen of North America, AFL-CIO; Irving M. King and Stephen G. Seliger, Chicago, Ill., on brief.
 Before MATTHES and BRIGHT, Circuit Judges, and MILLER, Judge.*
 MILLER, Judge.
 
 
 1
 Petitioner (hereinafter "Company") seeks review of a decision and order of the National Labor Relations Board (hereinafter "board")[1] and requests that the court deny enforcement of the order. The board cross-petitions for enforcement of the order.
 
 
 2
 In its decision, the board concluded that the Company violated section 8(a)(1) and (3) of the National Labor Relations Act, as amended (hereinafter "Act") (29 U.S.C. § 158(a)(1) and (3)),[2] by issuing written warnings to employees Ken Walburn, Rick Turner, and Ronald Guy on or about February 10, 1975,[3] because they engaged in union activities; by suspending Walburn for three days on or about February 10 and by discharging him on or about March 7 because of his union activities; by discharging employee Elmer Combes on or about February 20 because of his union activities; by refusing to reinstate Combes and Walburn individually to their former positions of employment; and (section 8(a)(1) only) by threatening, restraining, or coercing witnesses for General Counsel through its attorney at a board hearing.
 
 
 3
 The board ordered, inter alia, that the Company and its officers and agents cease and desist from discharging, suspending, refusing to reinstate or otherwise discriminating against Walburn, Combes, Turner, and Guy because of their support and/or assistance to the Union (Local 222, Meat and Allied Food Workers Union, Amalgamated Meat Cutters and Butcher Workmen of North America, AFL-CIO), or because they engaged in any union activities or any other activities protected by the Act; from issuing warning notices to employees because they support the Union or engage in other concerted activities protected by the Act; and from threatening, restraining, or coercing witnesses giving testimony at a board hearing. Further, it ordered the Company and its officers and agents to remove the "late warnings" from the personnel records of Walburn, Turner, and Guy for February 10, 1975; to offer Walburn and Combes immediate and full reinstatement to their former positions or, if these positions no longer exist, to substantially equivalent positions, without prejudice to their seniority or other rights and privileges; and to make Walburn and Combes whole for any loss of pay suffered by them by reason of the Company's discrimination against them.[4]
 
 BACKGROUND
 
 4
 The Company operates plants in the Midwest, including Emporia, Kansas, the scene of the involved incidents. Since the opening of the Emporia plant in 1969, the Union has attempted to organize the employees. At an election conducted by the board in 1971, the employees voted to not be represented by the Union. In the later part of 1974, the Union began an organizing campaign. Among the employees who were active in this campaign were Ken Walburn, Rick Turner, Arnold Guy, and Elmer Combes. On at least one occasion, Combes was warned by a supervisor (McMannes) about his union activities.
 
 
 5
 The Company has a policy of disciplining employees who are absent or tardy without excuse. For the first violation, an employee receives a written warning; for the second violation within twelve months, there is a written warning and a suspension; and for the third violation within twelve months, the employee is discharged. Employees are allowed a fifteen-minute break after two-and-a-half hours of work and a thirty-minute break after five hours. Walburn, Turner, and Guy worked in the offal department, where the temperature ranges from twenty-eight to thirty-two degrees. Employees in that department regularly took unscheduled "warm-up" breaks if their work was current and frequently extended their scheduled breaks by as much as fifteen minutes. As a matter of practice, employees were, on occasion, informally warned rather than disciplined for extending their breaks.[5]
 
 
 6
 Employees in another department complained to Superintendent William Lahr that employees in the offal department were taking extended breaks. He reported the complaints to the plant manager, who directed him to take up the matter with the foreman. Lahr then spoke to Tony Tabares, the offal department supervisor. At the beginning of the shift on February 10, Tabares warned offal department employees to not disobey the rules regarding the length of time an employee could remain on break. Tabares and fellow supervisor Bradstreet timed six of the nine offal department employees on their first break following the warning. However, neither of them observed the precise time when the six left on their break. Bradstreet checked his watch and stated that the time was 5:22 p. m., but Tabares said that the employees had been gone for some time and that the time should run from 5:20 p. m. (characterized as "arbitrary" by Bradstreet). Bradstreet recorded the times taken by the six employees: three of them were punctual (within the fifteen-minute break); Walburn, Turner, and Guy were twelve minutes over. Regarding the three who were not timed, Tabares and Bradstreet did not know when one took his break; another returned from his break with Walburn, Turner, and Guy, but he was elsewhere before the break, and the supervisors did not know or estimate when he began his break; and the third returned from his break some four minutes before Walburn, Turner, and Guy, but he had also been elsewhere, and the supervisors did not know when he had left on his break.
 
 
 7
 Tabares reported to Lahr that Walburn, Turner, and Guy had taken an extended break, and Lahr directed him to talk with them. He told the three they had violated Company policy by taking an extended break and that their personnel records would reflect it. One of the employees who had not been timed asked why he had not received a reprimand, since he had taken as long on his break as Walburn, Turner, and Guy. Tabares responded that they had lost track of him, but perhaps he should be reprimanded. The employee then stated he had only been kidding. Tabares threw away the paper with the recorded times on break of the six employees. It was then ascertained that Walburn was due for a suspension, and he was given a written warning and a three-day suspension; Turner and Guy were given written warnings. For a week or two after February 10, the offal department employees adhered to the scheduled breaks, but, thereafter, the old habit of informal and extended breaks resumed. On March 7, Walburn failed to report to work or to call in absent as required and was discharged.[6]
 
 
 8
 On the morning of February 15, $86 worth of cigarettes was stolen from a cigarette vending machine in the Company's cafeteria.[7] Personnel director Daryl Silkman testified without contradiction that he was informed of the theft by supervisor Doug McMannes the same morning; whereupon he went to the cafeteria to see the assistant manager, who said he did not know of any witnesses. Silkman went to the security post to see the guard, who said he had been told of the theft, but did not know of any witnesses. Four days later Silkman learned of Combes' participation in the theft "through the grapevine," as the board put it. The following morning, Silkman and McMannes spoke with supervisor Claude Schultz, who, according to Silkman's information, had acknowledged witnessing the theft when contacted by the plant engineer, Gene Hudson. Schultz said he had seen Combes getting cigarettes out of the machine and passing them out in the cafeteria, but he could not identify any other employees involved in the theft; however, he stated that two other employees, Cal Yeager and Joe Walford, were seated with him in the cafeteria at the time.[8] When summoned to the plant manager's office, Yeager and Walford said they had seen Combes passing out cigarettes in the cafeteria, but could not identify any other individuals involved. Schultz, Yeager, and Walford each wrote out a brief statement that he had observed Combes taking cigarettes from the machine and passing them out in the cafeteria on the morning of the theft. (The statements were dated the date of the theft.) Combes was summoned to the plant manager's office, where he admitted taking two packs of cigarettes, at the same time insisting that others (whom he refused to identify) also took cigarettes. He was discharged shortly thereafter.[9]
 
 
 9
 A week after Combes' discharge, Harry Hendershot, the Company's Assistant Vice President for Labor Relations, went to Silkman's office and asked to talk to Schultz, Yeager, and Walford. They were brought to the office and asked what had happened in the cafeteria on the morning of the theft. Walford stated that an employee, Larry Redburn, had put money in the cigarette machine but had not received any cigarettes; that Combes told Redburn the machine was open and to take a pack. Hendershot asked whether they could name any other individuals, and one employee's name was mentioned; however, when Hendershot contacted him, he replied that he had seen Combes take cigarettes but could not identify any others and did not know of any witnesses. The following day, Silkman asked Redburn whether he had put money in the cigarette machine, had not received any cigarettes, had then opened the machine, and had taken a pack at the suggestion of someone. Redburn said this was true, but he did not know whether Combes was the person who told him to open the machine; he also stated that he did not know any other individuals who took cigarettes or witnessed the theft. Hendershot and Silkman also spoke to employee Greg Barnett, who stated that he had not seen anyone take cigarettes and did not know of any witnesses. Testimony at the hearing indicates that at least six or seven unidentified employees had helped themselves to cigarettes before Combes came into the cafeteria; that Combes threw packs of cigarettes to co-workers; that supervisor Schultz observed Combes, but did or said nothing to stop him; that, as he was leaving, Combes handed a pack to McMannes, who was just arriving; and that McMannes and supervisor Steve Kemp secured the front of the machine and turned it to the wall.
 
 
 10
 In his opening statement at the unfair labor practice hearing before the Administrative Law Judge (ALJ) and with all witnesses present, the Company's counsel made the following comment regarding the cigarette theft incident:
 
 
 11
 (W)e just want the Administrative Law Judge to be aware of the fact, and I think witnesses should be aware of the fact, that there is no immunity of testimony for any type of criminal prosecution by virtue of their testimony before you this morning or in the next few days, and that if any new evidence is introduced that would indicate that anybody else was involved in this incident, that the company feels duty bound to investigate this new evidence and would have to take whatever action that would be appropriate depending on that particular evidence.
 
 
 12
 During the hearing, five witnesses refused to testify to the names of individuals other than Combes who stole cigarettes; three of the five stated they would not jeopardize the jobs of others and subject them to criminal prosecution. The Union, as charging party, refused to call any witnesses to testify because, so it argued, the Jencks rule[10] would require disclosure of the witnesses' affidavits, and there was no assurance that names in the affidavits of any cigarette thieves would be protected.
 
 
 13
 Immediately following Company counsel's opening statement, the ALJ said: "I thank you very much for your comments. They may prove to be very helpful to me as the case progresses." However, when the ALJ got around to his decision, he severely reprimanded Company's counsel for his intimidation of witnesses.
 
 
 14
 In its decision, the board observed that, assuming the correctness of Company counsel's statement, there would have been no cause for concern about intimidation if Company counsel's statement had been made to the ALJ and the General Counsel rather than in open court before the witnesses.
 
 OPINION
 
 15
 There are three issues involved in this appeal: (1) whether the board properly concluded that Company counsel's statement at the hearing before the ALJ violated section 8(a)(1) of the Act; (2) whether the board's conclusion that the Company violated section 8(a)(1) and (3) of the Act by disciplining employees Walburn, Turner, and Guy is supported by substantial evidence; and (3) whether the board's conclusion that the Company violated section 8(a)(1) and (3) of the Act by discharging employee Combes is supported by substantial evidence.
 
 
 16
 1. Statements of Company's Counsel at Hearing
 
 
 17
 We agree with the board that Company counsel's opening statement at the hearing before the ALJ interfered with the presentation and development of the General Counsel's case. Notwithstanding that such statements may have been technically correct, we are persuaded that, in violation of section 8(a)(1) of the Act, they intimidated prospective employee-witnesses in the exercise of their section 7 rights,[11] which include the right to invoke the board's processes and to testify at its proceedings. See NLRB v. Scrivener, 405 U.S. 117, 92 S.Ct. 798, 31 L.Ed.2d 79 (1972). Although the ALJ should have warned Company's counsel to desist from making intimidating statements (instead of giving the appearance of countenancing them), thereby possibly avoiding this issue, his failure in this respect does not excuse Company counsel's statements.
 
 
 18
 The General Counsel's theory of this aspect of the case was that Combes had been discriminatorily discharged since, as a result of what the board termed a "shoddy investigation," other employees involved in the theft of cigarettes had not also been identified and discharged. Therefore, refusal of certain employee-witnesses to name individuals (other than Combes) who stole cigarettes[12] clearly jeopardized the General Counsel's case. That this was Company counsel's strategy is clear from his position at the hearing, namely: that he would grant anonymity to all employees involved in theft of cigarettes in exchange for a stipulation from the counsel for General Counsel that "disparate treatment" was not one of the theories of the case; also, from the following statement in the Petitioner-Company's brief:
 
 
 19
 Petitioner's counsel, in his opening remarks, stressed the even handed treatment of the employees. It had discharged Combes upon learning of his participation in the theft. It would treat equally other employees found to have committed the same offense.
 
 
 20
 The Company argues that the board could not find Company counsel's statements in violation, because the General Counsel did not amend the complaint and litigate the issue at the hearing. However, as found by the board, the statements in question occurred directly on the record at the hearing, and the issue was litigated on the record before the ALJ and briefed before the board. McGraw-Edison Co. v. NLRB, 419 F.2d 67, 77 (8th Cir. 1969). Under such circumstances, amendment of the complaint was not required to raise the issue and to inform the Company thereof.
 
 
 21
 2. Company's Disciplining of Walburn, Turner, and Guy
 
 
 22
 We are satisfied that ample evidence supports the board's finding that, in violation of section 8(a)(1) and (3) of the Act, the Company disciplined Walburn, Turner, and Guy for their union activities rather than for extending their breaks. Although there is evidence that other employees in the plant had complained about abuses of break privileges by employees in the offal department, the latter worked in temperatures ranging from twenty-eight to thirty-two degrees and regularly took unscheduled "warm-up" breaks when the workload permitted; also, because of the working conditions in the offal department, the Company saw fit to not apply the rules regarding unscheduled breaks and tardiness, confining itself to occasional warnings about such conduct. It was in this setting that the survey in question was conducted by Tabares and Bradstreet. The survey could hardly be called even-handed, since three of the nine employees on the particular shift selected for the survey had been working elsewhere before the break, and no attempt was made to include them in the survey. (One of them told Tabares he had taken as long on his break as Walburn, Turner, and Guy.) Three others were found to not have violated the tardiness rule; and Walburn, Turner, and Guy were found in violation. However, the record of the survey was destroyed after Tabares reported to Superintendent Lahr that Walburn, Turner, and Guy had returned late from their break, a further indication of the carelessness with which the survey was handled.
 
 
 23
 Perhaps most damaging to the Company's position is that shortly after the disciplining of Walburn, Turner, and Guy, the employees reverted to the practice of taking extra breaks and extending scheduled ones without being disciplined by the Company. Thus, the board was justified in inferring that the Company's action against Walburn, Turner, and Guy was not motivated by a legitimate business purpose. Shattuck Denn Mining Corp. v. NLRB, 362 F.2d 466, 470 (9th Cir. 1966).
 
 3. Company's Discharge of Combes
 
 24
 In its decision on this issue, the board said:
 
 
 25
 In our judgment, the evidence preponderates in favor of finding that the Respondent (Company) discharged Combes because of his union activities. While Combes admittedly took cigarettes, he was not the only employee who did so. . . .Initially, the Respondent conducted no investigation of the incident. Supervisor Schultz saw Combes steal the cigarettes but did nothing about it. Supervisor McMannes received some of the stolen cigarettes from Combes immediately after the incident but took no action at that time. The Respondent only became interested 4 days later when Silkman learned about it through the grapevine.
 
 
 26
 Thereafter, Silkman followed up on the lead and was able to get the affidavits of Walford, Yeager, and Schultz that Combes stole cigarettes. Despite the fact that the affidavits were given several days after the theft, all three affidavits were back dated to the day of the incident. This makes the investigation appear more swift and responsive to the theft than it was.
 
 
 27
 No further investigation occurred until the week after Combes' discharge, when Hendershot and Silkman asked some five other employees about the theft and whether they saw who stole cigarettes.
 
 
 28
 In sum, the Respondent never conducted a complete and thorough investigation. The Respondent investigated only after Silkman discovered that Combes was one of the employees involved. The investigation focused on Combes without regard to discovering others who took cigarettes. On the basis of the entire record, we find that Respondent discharged Combes not for stealing cigarettes, but rather for his union activity in violation of Section 8(a)(3) and (1) of the Act. Cf. Shattuck Denn Mining Corporation, supra.
 
 
 29
 We hold that the board's conclusion that the Company discharged Combes for his union activity, rather than for stealing cigarettes, is not supported by substantial evidence.
 
 
 30
 The failure of Schultz to promptly report the theft was, if anything, favorable to Combes;[13] the assertion that Silkman only learned of the theft four days after it occurred is contrary to Silkman's uncontradicted testimony that he learned of it from McMannes on the morning it occurred; and the further assertion that initially the Company conducted no investigation is also contrary to Silkman's uncontradicted testimony.
 
 
 31
 The handwritten statements of Walford, Yeager, and Schultz all appear on a single sheet of paper, are not in affidavit form, and are not notarized. The board simply infers that their backdating to the date of the theft "makes the investigation appear more swift and responsive to the theft than it was." However, the Company does not rely on the date of the statements to show that an initial investigation was begun on the day of the theft, but on the uncontradicted testimony of Silkman. Walford testified that he exercised his own judgment and dated his statement February 15, because "that is the date that it (the theft) happened." There is no evidence that anyone at the management level of the Company had anything to do with the backdating.
 
 
 32
 The board's statement that the Company investigated only after Silkman discovered that Combes was one of the employees involved is contrary to the evidence. After learning of the theft from McMannes, Silkman contacted the assistant manager of the cafeteria and a guard. Not until Silkman received a telephone call from the plant engineer was Combes' name mentioned. The board's further statement that the investigation focused on Combes without regard to discovering others who took cigarettes lacks evidentiary support and, indeed, is contradicted by the fact of a resumption of the investigation the week after Combes' discharge. In saying that the Company "never conducted a complete and thorough investigation," the board seems to imply that an employer is somehow responsible for the failure of its employees who are contacted during an investigation to identify others involved in a theft. This ignores the fact of life that plant workers are generally reluctant to put their finger on their co-workers.[14] That Combes, who admitted participation in the theft,[15] was the only participant to be identified by his co-workers is no ground for finding the Company guilty of "disparate treatment" in discharging him and not discharging others. Whether the fact that Combes was engaged in union activities was a factor in his being identified by his co-workers as a participant in the theft we do not know. Even if it was, this would not prevent the Company from discharging him for theft. NLRB v. Ace Comb Co., 342 F.2d 841, 847 (8th Cir. 1965). See NLRB v. Breitling, 378 F.2d 663, 665 (10th Cir. 1967).
 
 
 33
 The board's order (1) to cease and desist from discharging, refusing to reinstate, or otherwise discriminating against Elmer Combes, (2) to offer Elmer Combes immediate and full reinstatement to his former position, and (3) to make whole Elmer Combes for any loss of pay suffered by reason of the Company's discrimination against him, is set aside.[16] The remainder of the board's order will be enforced.
 
 
 
 *
 The Honorable Jack R. Miller, United States Court of Customs and Patent Appeals, sitting by designation
 
 
 [1]
 Reported at 226 N.L.R.B. No. 210 (1976)
 
 
 [2]
 29 U.S.C. § 158(a) provides in part as follows:
 (a) It shall be an unfair labor practice for an employer
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
 . . . in
 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. . . .
 29 U.S.C. § 157 provides as follows:
 Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.
 
 
 [3]
 All dates hereinafter refer to 1975 unless otherwise indicated
 
 
 [4]
 The board's order also required the Company to provide records needed to compute backpay, to post copies of a specified notice, and to notify the Regional Director with respect to compliance
 
 
 [5]
 A year before the organizing campaign, one offal department employee was timed on a break because he was suspected of leaving the plant premises during scheduled breaks
 
 
 [6]
 The board in its decision noted that there is no allegation that the Company's finding of a violation of the rules by Walburn on March 7 was improperly motivated. However, Walburn would not have been discharged on March 7 but for the disciplinary action against him on February 10. If the latter were found to be unlawful, its unlawfulness would carry over to the discharge on March 7
 
 
 [7]
 The machine was owned and operated by Midwest Vending Company
 
 
 [8]
 Schultz received a reprimand for failing to promptly report the theft to his superiors
 
 
 [9]
 The policy of the Company was to discharge employees for theft, and in the year preceding the hearing before the Administrative Law Judge at least four employees had been discharged in accordance with this policy: two for stealing soft drinks from the cafeteria, one for stealing a wiper blade from a fellow-worker's car, and one for stealing a large bone worth no more than fifty cents
 
 
 [10]
 Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), cited in Ra-Rich Manufacturing Corp., 120 N.L.R.B. 503 n.2 (1958)
 
 
 [11]
 See note 2, supra
 
 
 [12]
 Witnesses Combes, Effland, Kellerman, Shade, and Smith declined to do so
 
 
 [13]
 The board's statement that McMannes also failed to take prompt action is contrary to Silkman's uncontradicted testimony that he was informed by McMannes of the incident on the morning it occurred. The prompt reprimand of Schultz by the Company's plant manager belies any lack of interest on the part of the Company in proceeding immediately with an investigation. The board argues that the reprimand was to "lend legitimacy to its (the Company's) concern about the theft of cigarettes" but more than suspicion is needed to support such an argument. General Mercantile & Hardware Co. v. NLRB, 461 F.2d 952, 956 (8th Cir. 1972)
 
 
 [14]
 As noted earlier, Combes declined to identify any others who participated in the theft
 
 
 [15]
 The brief filed by the Union as Intervenor argues that "the sole basis for Combes' discharge" was the written statements of Walford, Yeager, and Schultz. This apparently overlooks the board's finding that Combes admitted participation in the theft
 
 
 [16]
 The notice ordered to be posted should be modified as it relates to Combes